1  WILLIAM M. SIMPICH , ESQ. (SB#106672)
   1736 Franklin, Tenth Floor
2  Oakland, California 94612
   Telephone:  (510) 444-0226
3  Facsimile (510) 444-1704

4  TESFAYE W. TSADIK, ESQ. (SB#108103)
   Law Offices of Tesfaye W. Tsadik
5  1736 Franklin, Tenth Floor
   Oakland, California 94612
6  Telephone:  (510)-839-3922
   Facsimile (510) 444-1704

7
   Attorneys for Plaintiffs
8

9
                IN THE UNITED STATES DISTRICT COURT
10
                NORTHERN DISTRICT OF CALIFORNIA
11

12
   **Harry Whitlock, on behalf of his deceased**
13 **children Melissa Whitlock and Michael**
   **Whitlock; Fern Sue Broyles; Shebia**          Case No. _____
14 **Cornett, as guardian ad litem for**
   **Franklin Winnemucka; Melissa**               **COMPLAINT FOR DAMAGES,**
15 **Anastasiou Dalton, individually and as**      **INJUNCTIVE AND DECLARATORY**
   **guardian ad litem for Kala Smith,**           **RELIEF**
16 **Rebekah Mabery Anastasiou, and**
   **Michael Mabery; Angela Harrington, as**          1.   Negligence
17 **guardian ad litem for John Davies, II,**         2.   Negligence Per Se
   **Melissa Davies, and Michelle Davies;**           3.   Intentional Infliction of
18 **Leland J. Chalmers, Jr.; Wanda Farmer;**              Emotional Distress
   **Linda Gayle Ford; Alvin E. Ford;**               4.   Negligence Causing Fear
19 **Timothy E. Ford; Daniel W. Ford; Tracy**              Of Cancer, et al.
   **L. Ford; Melinda J. Ford; Juanita**              5.   Strict Liability
20 **Shumaker; Danielle Smith, individually**         6.   Nuisance
   **and as guardian ad litem for Daniel**            7.   Fraudulent Concealment
21 **Mendez; Mary Sweet, Loretta Thomsen,**           8.   Gross Negligence
   **Jack Tuttle, Jo Ann Wakeland,**                  9.   Loss of Consortium
22 **individually and as guardian ad litem for**     10.   Battery
   **Jonathan Wakeland; Ralph Weber; Ruth**          11.   Trespass
23 **Weber;**                                        12.   Willful Misconduct
                        **Plaintiffs,**              13.   Malicious toxic exposure
24                 **vs.**
                                                  (Jury trial demanded)
25 **Pepsi Americas; Whitman Corporation;**
   **Pneumo Abex Corporation; Does I-XX,**
26
                    **Defendants.**
27

28                                    -1-

1

2

3

INTRODUCTION

4

1.      Plaintiffs allege injuries sustained at the hands of entities that acknowledge the

5

use and wrongful disposal of ultra hazardous, regulated, toxic chemicals between 1945 and the

6

present.

7

2.      Each of the plaintiffs, resided in the vicinity of the site during the time period set

8

forth in the preceding paragraph.  Plaintiffs also allege that these injuries are due to the owners

9

and operators of the now-shuttered site, which continues to generate thousands of gallons of

10

contaminated water each year into the environment.   These parties refused to engage in prompt

11

and meaningful action to clean up the site, inform the residents of the dangers of the site, protect

12

the reserves of the Trust specifically designed to protect the health and safety of the residents and

13

former residents and the environment itself or to even admit that the contamination is

14

endangering the environment as well as the health, safety and welfare of the City's citizens.

15

3.      Plaintiffs further allege that all of these defendants and Does 1-100 have caused,

16

maintained and/or contributed to a nuisance and imminent and substantial endangerment at the

17

site in that the Defendants have disposed of quantities of solid waste and hazardous waste at the

18

site over sixty- year period, resulting in a condition which is potentially injurious to health and

19

constitutes an obstruction to the free use and enjoyment of the areas in the vicinity of the site.

20

This activity has and continues to endanger certain plaintiffs, who need to be indemnified for real

21

property in the vicinity of the site that they owned in the past.  Further, the solid waste and

22

hazardous waste at and in the vicinity of the site is continuing to migrate through the

23

environment and is threatening to further contaminate the groundwater of the successors to the

24

land owned by various plaintiffs.

25

4.      The Plaintiffs seek relief requiring that the Defendants fully abate the existing

26

nuisances.

27

5.      Plaintiffs have stated claims under California law, invoking the jurisdiction of this

28

-2-

1  court pursuant to the principles of diversity.    The unlawful acts and practices alleged herein

2  occurred in the City of Willits or in the County of Mendocino, which is situated in the Northern

3  District of California..

4

### PARTIES

5

6        6.      All of the plaintiffs are residents or former residents of the city of Willits, workers

7  at the site, or associated with workers in the site or related to plaintiffs exposed to the

8  contaminants.

9        A.      Plaintiff Fern Sue Broyles lives in Yale, Oklahoma, and learned that Remco

10  contaminants may have affected her health during the applicable statute of limitations.

11        B.      Shebia Cornett is the guardian ad litem for her son Franklin Winnemucca.  They

12  reside in Anaheim, California.

13        C.      Plaintiff Melissa Anastasiou Dalton lives in Turlock, California, and is also the

14  guardian ad litem for her children Kala Smith, Rebekah Anastasiou and Michael Mabery.  She

15  learned that Remco contaminants may have affected her health during the applicable statute of

16  limitations.

17        D.      Plaintiff Angela Harrington is the guardian ad litem for her children John Davies,

18  II, Melissa Davies, and Michelle Davies.  This family resides in Willits, CA.

19        E.      Plaintiff Leland J. Chalmers, Jr. lives in Ukiah, Ca., worked at the Remco plant

20  between approximately 1973 to 1976, and learned that Remco contaminants may have affected

21  his health during the applicable statute of limitations.

22        F.      Wanda Farmer lives in Keizer, Oregon, and learned that Remco contaminants may

23  have affected her health during the applicable statute of limitations.

24        G.      Linda Gayle Ford, Alvin E. Ford, Timothy E. Ford, Daniel W. Ford, Tracy L. Ford,

25  Melinda J. Ford, and Juanita Shumaker live in Kingston, Idaho, and learned that Remco

26  contaminants may have affected their health during the applicable statute of limitations.

27

28                                                    -3-

H.     Danielle Smith lives in Ukiah, Ca., and is the guardian ad litem for her son Daniel Smith.  She learned that Remco contaminants may have affected her health during the applicable statute of limitations.

I.     Mary Sweet lives in Winton, Ca., and learned that Remco contaminants may have affected her health during the applicable statute of limitations.

J.     Loretta Thomsen lives in Reno, Nevada, and learned that Remco contaminants may have affected her health during the applicable statute of limitations.

K.     Jack Tuttle lives in Janesville, Ca., and learned that Remco contaminants may have affected his health during the applicable statute of limitations.

L.     Jo Ann Wakeland lives in Ukiah, Ca., is guardian at litem for her son Jonathan Wakeland, and learned that Remco contaminants may have affected her health during the applicable statute of limitations.

M.     Ralph Weber and Ruth Weber live in Vancouver, Wa., and learned that Remco contaminants may have affected their health during the applicable statute of limitations.

N.     Harry Whitlock lives in Lakeport, Ca., and has filed suit on behalf of his deceased children Melissa Whitlock and Michael Whitlock, after learning that Remco contaminants may have affected their health during the applicable statute of limitations..

7.     Since 1997, the site has been owned and operated by the Willits Environmental Remediation Trust, a national remediation trust management company, and a Nevada limited liability company (LLC).

8.     Between 1988 and 1997, the site was owned and operated by defendant Remco Hydraulics, Inc.,  a wholly owned subsidiary of defendant M-C Industries, Inc., a California corporation ('M-C'), collectively "Remco/M-C').

9.     Between 1977 to December 1988, Abex Corporation, a dissolved Delaware corporation, the predecessor of defendant Pneumo Abex, a Delaware corporation ("ABEX") owned and operated the Site.

-4-

10.     Between 1968 to 1977, the Stanray Corporation ("Stanray"), formerly a Delaware corporation, owned and operated the site after acquiring it from Remco Hydraulics which operated the site from 1958 to 1968 as Remco Manufacturing Company, Inc.. The defendant Whitman Corporation ("Whitman"), a Delaware corporation, formerly known as IC Industries, Inc., is the legal successor by statutory short- form merger to Stanray Corporation which was a successor of Remco Hydraulics..

11.     During 2000, the assets and liabilities of Whitman and Pnuemo Amex were purchased by Defendant Pepsi Americas.  On August 22, 1995, REMCO and its parent M-C filed voluntary petitions for relief pursuant to the United States Code, 11 U.S.C. §101, et seq., and have hence dissolved with no known assets or insurance polices.  Hence, they are not defendants in this action.

## FACTUAL BACKGROUND

### Geographical Location

12.     The site is a plot of 7.5 acres in the center of the town of Willits in northern California. The site is presently paved and fenced with a main building occupying approximately 3.5 acres, by developed property, bounded by horse corrals and commercial structures to the west, residential homes and motels to the north, Highway 101 and a shopping center to the east, and a seasonal drainage ditch, the California Western Railway, Walnut Street and the Blossar Elementary School to the south.

13.     The site slopes from west to east with a northerly slant. Surface runoff flows into a storm drain that runs along the northern edge of the facility and then into Baechtel Creek. Baechtel Creek is intermittent, flowing only with winter rains, and a tributary into Outlet Creek Eventually all water exits the valley via Outlet Creek in the northwestern corner.

14.     Most groundwater is contained in the 12 square miles of alluvium that line the floor of the Little Lake Valley where Willits is located. This formation, ranging in thickness from

-5-

1    68-250 feet, contains both unconfined shallow, and deeper confined aquifers.

2        15.    Groundwater recharge is primarily derived from precipitation. Water table levels

3    rise in the rainy months, sometimes coming within 2 feet of ground surface. Groundwater

4    discharges in three ways, through springs, through effluent to streams, and through wells. Most

5    wells in the valley are fairly shallow, approximately 50 feet deep, tapping the 4 unconfined water

6    table aquifer.

7        16.    The site itself lies on the alluvium along the western edge of the valley.

8    Groundwater studies of the site found the water level in the upper unconfined aquifer to range

9    between 2 to 10 feet below ground surface depending on the season. The nearest wells are those

10   on site and the residential wells on Franklin Street just across the north property line.

11       **The contamination**

12       17.    The site itself lies on the alluvium along the western edge of the valley.

13   Groundwater studies of the site found the water level in the upper unconfined aquifer to range

14   between 2 to 10 feet below ground surface depending on the season. The nearest wells are those

15   on site and the residential wells on Franklin Street just across the north property line.

16           a.    Hexavalent and trivalent chromium. Hexavalent chromium is a known

17                 carcinogen and more toxic than trivalent chromium. Breathing very high

18                 levels of chromium (VI) can damage and irritate the nose, lungs, stomach

19                 and intestines. People who are allergic to chromium may also have asthma

20                 attacks after breathing high levels of either chromium (VI) or (Ill). Long

21                 term exposures to high or moderate levels of chromium (VI) cause damage

22                 to the nose (bleeding, itching, sores) and lungs, skin ulcers, stomach upsets

23                 and ulcers, and can increase one's risk of non-cancer lung diseases.

24                 Ingesting very large amounts of chromium can cause stomach upsets and

25                 ulcers, convulsions, kidney, liver damage, and even death. Skin contact

26                 with liquids or solids containing chromium (VI) may lead to skin ulcers.

27

28                                              -6-

1          Some people have allergic reactions including severe redness and

2          swelling.

3     b.    Various chlorinated volatile organic compounds ("VOCs"), including but

4          not limited to Dichloroethane, 1-2 Dichloroethane, Tricholorethane,

5          l,l,lTrichloroethane and Tetrachlorethane. Other serious health effects

6          attributed to VOCs include irritation to eyes and skin, chronic infections,

7          bony anomalies, immune dysregulaton, endocrine disruption, liver

8          damage, and a variety of other injuries.

9     c.    Petroleum hydrocarbons. Prolonged skin contact with diesel and waste oil

10         may result in dermatitis due to defatting of the skin.

11    d.    Methyl ethyl ketone ("MEK, also known as 2-Butanone),is a widely used

12         industrial solvent especially for plastic coatings and adhesives. MEK is

13         readily absorbed by all exposure routes. MEK displays relatively low

14         toxicity, although MEK is known for increasing the toxicity of a number

15         of other chemicals, including 2-hexanone, —hexane and

16         carbontetrachloride. Acute doses are irritating at the site of contact

17         (especially in the eyes) and can produce skin defatting and inflammation.

18         Other dangerous solvents were also located on the site.

19    e.    Dioxins were created at the Remco site as a result of burning and other

20         industrial activities.  PCBs were also created due to this activity. PCBs

21         were also used widely as coolants and lubricants in transformers,

22         capacitors, and other electrical equipment. The manufacture of PCBs

23         stopped in the United States in October 1977. Ingestion and inhalation are

24         considered to be potential routes of exposure.   These chemicals are known

25         carcinogens and cause other serious injuries.  Several dermal and ocular

26         effects, particularly skin rashes and eye irritation, have been associated

27

28                              -7-

1    with PCBs.

2    f.    Other dangerous chemicals, such as cadmium and nickel, are also on and

3    emanating from the site.

4

5    18.   To this day, the extent of this toxic plume has not been determined. Making matters

6    worse, the Water Board recently discovered an old underground riverbed containing gravel and

7    sand which provides a preferential pathway for these contaminants. This riverbed not only makes

8    it more difficult to determine the present direction of the plume, but it assures that the plume is

9    traveling much faster than usual.

10    19.   The US. Department of Health and Human Services, Public Health Services,

11    Agency of Toxic Substances and Disease Registry (ATSDR) conducted extensive and through

12    investigation of the contaminants released from the site 1963-1995, concluded that residents of

13    Willits a higher risk of getting cancer and non cancer medical contusions as a result of exposure

14    to airborne hexavalent chromium negligently emitted from the site by the Defendants.

15    **Manufacturing processes**

16    20.   Manufacturing processes took place preliminarily inside a main building at the Site.

17    Plaintiffs are informed and believe that barrels of hazardous waste continue to be buried

18    underneath some of the paved areas to this day.

19    21.   A concrete-floored metal building of approximately 154,000 square feet formerly

20    used for offices and manufacturing operations, occupies more than half of the Remco property.

21    The eastern end of this building housed office and design facilities for the former Remco facility.

22    The western portion of the property contains two above-ground storage tanks, which were used

23    primarily for the storage of used oil when the plant was operating, and a building formerly used

24    for hazardous materials storage.

25    22.   There were numerous tanks on site, which was unpaved for the majority of its

26    fifty-year history between 1945 and 1995. Those tanks within the building were used in the

27

28    -8-

chrome plating operation, including two above-ground plating tanks holding 3,000 gallons; five deep underground plating tanks containing from 1,100 to 4,700 gallons and located about 70 feet below ground surface; an aboveground plating tank containing 7,500 gallons; a chrome waste tank containing 10,500 gallons, and five aboveground tanks containing 5000 gallons of waste coolants, 5000 gallons of waste oils, two diesel fuel tanks of 10,000 gallons each, and a 500 gallon gasoline tank. All volumes are approximate.

23.    Remco produced items such as hydraulic and pneumatic cylinders used in a variety of military and civilian applications, including steering systems for nuclear submarines, the erecting beam cylinders for the Minuteman and Nike missile launch towers, the two main cylinders for the gate of the Oroville Dam, tunneling equipment, highway construction, and offshore drilling operations. Other items produced included linear actuators, accumulators and machined parts for use in large caliber gun barrels, recoilless rifles for the United States Army, construction equipment, oil and gas exploration and marine equipment. The processes used to produce These items included machining welding, sandblasting, painting and chrome plating. The cylinders for these products range in size with diameters of 2"-45" and lengths of up to 50 feet.

24.    Other items produced included linear actuators, accumulators and machined parts for use in large caliber gun barrels, recoilless rifles for the United States Army, construction equipment, oil and gas exploration and marine equipment. The processes used to produce these items included machining, welding, sandblasting, painting, and chrome plating.

25.    Three operations created wastes: Machining, plating, and finishing. Machining involves the use of lubricating oils and coolants, and uses solvents to spray on a piece before and after it is machined. Plating uses caustic baths and solvents to prepare pieces for plating while the actual plating baths contain various adds and metals, mainly chrome. Finishing required various hydraulic fluids and oils to test the finished product's performance.

26.    Finishing wastes are the least complicated. The hydraulic fluids used to test the

finished cylinders sometimes become contaminated and cannot be reused. These would be put into 5000 gallon drums and transferred to the 5,000 gallon waste coolant tank for pickup. For the most part, IT Corporation hauled these wastes to their Class I dump site in Martinez since 1974. However, prior to 1974, the coolant wastes were discarded into an outside sump, which was pumped and hauled by Page Septic Service. Page hauled these wastes to a dump site on his property about three miles northeast of the town of Wilts.

27.    The machine shops generated coolants and lubricating oils, as well as solvents containing VOCs.  Historically these wastes were transferred to the 5000 water coolant tank in the back. The Regional Water Board made a finding in 1985 that this waste was allowed to drain onto the pavement.

28.    The plating area generated the largest volume of waste. Chromium was used to plate the hydraulic cylinders onsite between 1963 until the closure of the facility in 1995, There were initially two waste streams from this area: The actual chromic acid rinsewaters and the cooling water circulated through the cooling coils that lined the plating tanks. This water would then be discharged to the storm drain system and thus into Baechtel Creek. In August 1981, a pinhole leak in one of the cooling coils contaminated this water with chromic add which ended up in the creek. About 25,000 gallons of contaminated creek water was pumped and hauled off-site. After this incident, Remco installed a sump to collect the bleed off water.

29.    The chrome plating wastes were collected in a sump under the two small chrome plating tanks, mostly rinsewater from the second rinse of plated pieces that was generally about 5% chromium. IT Corporation hauled about 14,000-20,000 gallons of this water to a Class I dump site. Prior to that, Page Septic Service hauled about 16,000-20,000 gallons a month from both this sump and a smaller outside sump located adjacent to the storm drain. The latter was subject to overflow with heavy rains and was used to collect all kinds of contaminated waters and site runoff. In 1998, a large quantity of wastes and pollutants were found at a dump site on the property belonging to Bob Peters of Shell Lane, about a half mile from the site. Since then to the

-10-

present, a number of additional dumpsites of Remco waste and pollutants have been found in the immediate vicinity of the site as well as other areas throughout the County.    In 1997, four depositions of Remco workers (Ronnie Wake, Ken Brown, Tony Kaser, and Bradley McCartney) were made public which reveal intentional and negligent acts of waste dumping and hazardous conduct committed by Remco workers under the direction of management. The dumpsites referred to in this complaint endanger the health and safety of several of the Plaintiffs' health and property, and are incorporated within the request for relief.

**HAZARDOUS WASTE DISCHARGES -- A SUMMARY FROM 1950s to 1995**

30.    The following events constitute a pattern of practice of accidental or intentional disposal of hazardous waste without a proper permit continuing up to the present day.

31.    During the period from 1958-1979, when the outside waste sump was in operation, citizen complaints of contamination reaching Baechtel Creek were frequent and both the Water Board and the Department of Fish and Game frequently requested Remco to remedy the situation.

32.    The Water Board made a finding that inspections from 1971 to 1975 revealed the aforementioned "outside chromic acid sump overflowing very frequently into the storm drain system. Lubricating oils dripped and were spilled into the storm drain. Other discharges included cooling water from chrome tanks and boiler blowdown. The cooling water tubes frequently leaked and chromic acid was present in the cooling water discharges."

33.    On May 24, 1979, the Regional Board issued Cleaning and Abatement Order (CAO) No. 79-102, which permitted the discharge of stormwater runoff and non-contact cooling water bleedoff into Baechtel Creek, which continued until the cooling water bleedoff was rerouted in the city sewer system in 1982.

34.    On March 31, 1981, the Water Board found that "on this date, Remco personnel discovered diesel oil on shallow groundwater ... an old galvanized pipeline from the diesel storage tanks to the boiler had a pinhole leak."

35. On August 10, 1981, the Water Board found that "Remco discovered that cooling tower bleedoff water contained chromium from a leaky cooling tube... approximately 25,000 gallons of cooling water and contaminated creek water were pumped and hauled."

36. Sometime between 1981 and 1987 a falling rod damaged welds within a chromic acid tank at the site. The damaged welds contributed to a release of approximately 100-500 gallons of chromic acid containing fluid into the surrounding soils.

37. On June 14, 1982, the Water Board received a phone report from a resident that chromic acid was being discharged into Baechtel Creek:   "...chromic acid was found to be rising out of the ground and discharging into the storm drain system. The area was dug up and a two inch plastic PVC joint was discovered to be broken."

38. In 1982, a Spill Prevention Council and Countermeasure Plan was established and a Monitoring and Reporting Program No. 83-11 was adopted, in order to prevent any new contamination to the soil and to monitor possibly migration of any past problems. Some monitor wells were put around the facility on or about 1982 to check for migration of suspected contaminants. However, as the wells were placed in a straight line and not a triangle, there was no way to produce a three point plane for assessing the groundwater gradient. Thus, the groundwater flow direction was uncertain and the wells were of little use.

39. On November 5, 1985, a fiberglass liner in one of the chromic acid tanks leaked, causing a portion of the tank to collapse. An estimated 200-300 gallons of chromic acid solution escaped into the ground during the tank removal and replacement process.

40. On May 15, 1986, the DOHS Contact Report determined that Remco's waste handling practices put them in violation of RCRA regulations with regard to the on-site storage of hazardous wastes. The waste chromic acid was picked up only every six months and collected in quantities of greater than 5,000 gallons.

41. On or about December, 1989, Remco discharged chromic acid directly into a storm drain system at the site.

-12-

1      42.    In 1990, CAO No. 90-10 was issued against Remco. Among other things, Remco

2  was ordered to provide a comprehensive storm water sewer lining project.

3      43.    On or about October, 1990, Remco was found to have chromic dust deposited

4  around the site.

5      44.    On March 13, 1991, Mendocino County Department of Public Health created a

6  pamphlet entitled "Notice of Possible Contamination of Your Well" for Remco's neighbors.

7  Oddly, the pamphlet mentions contamination as only a possibility rather than a virtual certainty.

8  The Department claims to have circulated this pamphlet. However, virtually none of the plaintiffs

9  ever saw this pamphlet.

10     45.    On April 30, 1991, the Water Board issued Cleanup and Abatement Order No. 91-

11 70 against Remco, Abex, M-C, the City of Willits and the Wilson Page Estate for a workplan

12 detailing among other things, how to cleanup and abate the threatened effects of past discharges.

13 This included a plan to define the horizontal and vertical extent of soil and groundwater

14 contamination on and offsite; Remco violated this order and this critical issue remains

15 unresolved today.

16     46.    On August 14-15, 1991, the Department of Toxic Substances Control (DTSC)

17 conducted an inspection of Remco, and found numerous violations of hazardous waste statutes

18 and regulations, including but not limited to, failing to immediately clean up all residues of

19 hazardous waste, containerize the residues, or treat them as hazardous waste; and storing and

20 treating waste without a hazardous waste facility permit.

21     47.    On or about October 1991, 1-1 tricholoroethane contained in-storm water runoff

22 was released into soil and groundwater at and in the vicinity of the site.

23     48.    On or about January 1993, hazardous wastes, including chromic acids and all of

24 the VOCs identified above, were discharged in storm water runoff from the site, and

25 subsequently released into soil and groundwater and in the vicinity of the site.

26     49.    In 1995, Remco declared bankruptcy. Manufacturing operations ceased shortly

27

28                                          -13-

thereafter. The Water Board issued CAO No. 95-94, which required decommissioning of plating tanks and submittal of a contingency plan. The manufacturing equipment and remaining inventory were removed from the site in 1996. The contents of the chrome tanks were removed, and the tanks were abandoned in place.  Further CAOs were issued during the late nineties naming Whitman and Pnemo Abex as responsible parties as well as their agent the  "Willits Environmental Remediation Trust", described in the next section.

50.    In 1996, the City of Willits, in its own capacity and as a representative of the People of the State of California, filed suit to abate an "imminent and substantial endangerment against Remco and the past owners of the Remco site in action C-96-0283-FMS of this court.

51.    In August, 1997, a consent decree was entered in the above mentioned case that resulted in the creation of the Defendant Willits Environmental Remediation Trust, the agent of Defendants Pneumo Abex and Whitman.

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

52.    Besides the Plaintiffs in this action, all of whom reside outside the city of Willits, even many of the local residents continue to live without adequate information. Very little has been spent on community relations and outreach, and very little is allocated for that effort.

53.    Plaintiffs in this action, all of whom live outside the city except for the minor children of Angela Harrington, were not aware of the health dangers posed to them by the Remco site within the statute of limitations in the state of California, with one exception:  Melissa Anastasiou Dalton did know about the existence of the Remco suit, but did not attribute the suit to her particular injuries until a period of time within the statute of limitations.

54.    Plaintiffs hereby affirmatively plead the discovery rule as that legal principle is applied and understood under the laws of the State of California, in response to any claim by any Defendants that any of Plaintiffs' causes of action are barred by any statute of limitations. Plaintiffs further plead that all action are timely pleaded in that they were recently discovered by Plaintiffs. Further, defendants fraudulently concealed their negligence and wrongful acts and

-14-

1    omission and the dangers emanating  therefrom form the Plaintiffs and have engaged in a

2    deceptive and fraudulent public relations campaign.  Defendants' conduct constitutes fraudulent

3    concealment and non-disclosure as that term has meaning under California law.

4    **1998 TESTING BY THE CITY OF WILLITS AND THE RESPONSE OF THE**

5    **WILLITS TRUST**

6    55.    In January 1998, the City of Willits Public Works Department, designated as the

7    Lead Public Agency, contacted various residents and took water samples at and around the site.

8    As a result of that testing it was discovered for the first time that at 37 Franklin Avenue, shallow

9    groundwater was found in the private residence well to contain concentrations of five chlorinated

10    solvents in excess of California drinking water standards. It is believed that additionally exposed

11    areas may be found further down gradient from the site, on the north side of Franklin

12    Avenue'and beyond. Contaminants have had many years to travel through the subsurface and

13    may be found in locations several hundred feet or more from their origin An example of this are

14    the detections of 1,1,1- Tricholorethane (TCA) at 62 Flower Street and 26 West Oak Street. TCA

15    is associated with the site, and is in fact one of the slower moving chlorinated solvents in the

16    subsurface.

17    56.     It should, be added that The Water Board reaffirmed these findings in early 1998

18    by discovering 5700 ppb of total chromium at a Texaco service station approximately two blocks

19    northeast of the site, vastly exceeding The EPA limits. In addition to private wells, chlorinated

20    solvents were detected in water at the storm drain discharge that drains the northern portion of

21    the Remco site. The storm drain discharge - point is located at Baechtel Creek a short distance

22    east of the Safeway Grocery Store, and north of the CWR trestle over Baechtel Creek. CVOCs

23    have been associated with this storm drain system since at least 1994, when Geosyntec found the

24    north property boundary storm drain alignment to contain CVOCs directly associated with the

25    Remco operation. Baechtel Creek is a potential freshwater habitat migratory fish spawning

26    habitat, wildlife corridor, contact and non-contact recreation, non-municipal drinking water

27

28                                                    -15-

1  source, and groundwater recharge source.

2        57.    Hexavalent chromium was detected at 5.9 milligrams per kilogram in a sample

3  taken from the south drainage ditch. This concentration exceeds the EPA Region IX standards for

4  residential soil. Children regularly walk through and may be exposed to the sediments within this

5  drainage. The Blosser Elementary School is to the south of this drainage ditch.

6        58.    On February 9, 1998, the Willits Trust provided the following response to the

7  testing by the City of Willits: Geohydrologist Dr. Anne M. Farr, site project manager for the

8  Willits Trust, submitted a declaration to the federal court stating in pertinent part that "although

9  the data recently collected by the City of Willits does provide a rough indication of the extent of

10  offsite contamination, that data does not indicate that contamination has invaded the City... in

11  addition, it is simply not accurate to state that the contamination is endangering the environment

12  as well as the health, safety and welfare of the City's citizens."

13        59.    On May 5, 1998, the Water Board issued CAO No. 98-59 to the Willits Trust

14  forthe Remco facility. Among other things, the CAO was issued for abandoning the chrome

15  plating underground storage tanks without obtaining permits or any other approval from the

16  requisite agencies, as well as for generating Thousands of gallons of hazardous waste annually

17  without submitting a hazardous material business plan.

18        60.    Since that date, additional samples have been taken from monitoring wells that are

19  showing a continued basis for alarm regarding the degree of contamination offsite.

20        61.    In early 1999, at a buried trench along the fence line of the north border of the site,

21  groundwater welled up and "ran off yellow" into the stem drain -- a strong indication that

22  chromium is present. Plaintiffs are informed and believe and hereby allege that the same happens

23  during the winter rains.

24        62.    In June and July of 1999, almost two years after the formation of the Trust, the

25  Trustee admitted that the amount of assets available would be inadequate to pay bills for the

26  following 18 months and belatedly tendered to Whitman and Pneumo Abex ("the Remedial

27

28                                            -16-

1    Defendants" in the Consent Decree) a "Note of Additional Qualified Payment" -- this request

2    could and should have been made on a far earlier date. The Trust then requested that the court

3    issue an order that would have conferred upon the Willits Trust, its trustees, technical consultants

4    and legal counsel blanket immunity for all past, current and future acts and/or failures to act. Its

5    proposed order also sought to interfere and frustrate the present and future review, oversight,

6    comment and monitoring roles of the Water Board and the California Department of Toxic

7    Substances Control (DTSC).

8           63.    The City of Willits and the State of California have been provided a draft

9    complaint from the Mendocino County District Attorney in conjunction with the Water Board

10   and DISC seeking to hold the Willits Trust, its trustees and technical consultants liable for

11   various violations of state and federal hazardous waste laws.  The trust is basically the pawn of

12   Defendant Whitman and is entirely dependent on it for its funding.

13          64.    Defendants' violation of the state and federal laws regulating hazardous materials

14   and chemicals have been numerous and repeated.   Defendants Whitman and Pneumo Abex also

15   concealed evidence throughout the litigation that led to the creation of the Consent Decree that

16   revealed both significant intentional and negligent waste dumping and other hazardous conduct.

17   Intentional conduct that has been concealed includes intentional dumping of hazardous chemicals

18   into drainage ditches under cover of night; weekly cleaning of radiators plugged with chromium

19   dust into the air and the vicinity of the school and the hospital; deliberately preventing

20   governmental authorities from imposing appropriate restrictions on contaminants discharged

21   from Remco by altering the water sample collections and testing sumps; regular dumping of

22   solvents in the vicinity of the gun shop; a pattern and practice of permitting hazardous chemicals

23   to be released into the ground, air and water in an unprotected manner; and a pattern and practice

24   of refusing to report spills and accidents to the Water Board despite a standing order to do so.

25   Plaintiffs have only become aware of the connection between their injuries and the contamination

26   within the applicable statute of limitations for the State of California.

27

28                                          -17-

1    65.     Moreover, each of the plaintiffs in this case only learned within the applicable

2    statute of limitations for the State of California that they may have suffered injury as a result of

3    the actions of these defendants.

4                          **FIRST CAUSE OF ACTION**

5                          (Negligence — All Defendants)

6    66.     Plaintiffs repeat and reallege each and every allegation contained in paragraph 1

7    through 65 the  preceding paragraphs with the same force and effect as if same were set forth at

8    length herein.

9    67.     By failing to take the necessary measures and such action to maintain and keep the

10   site in an adequate, safe, free from toxins, Defendants have subjected the plaintiffs to exposure to

11   toxins. This failure to act on the part of defendants is and continues to be grossly negligent,

12   reckless and wanton.  Pepsi Americas purchased the assets and liabilities of these Defendants,

13   and hence is equally liable.

14   68.     As a direct and proximate cause of Defendants gross negligence, reckless and

15   wanton conduct, the Plaintiffs have been exposed to hazardous chemicals which has caused or

16   will cause them to suffer or contract permanent injuries to their bodies, brains and nervous

17   system, severe physical pain and suffering and mental distress, and other injuries to the plaintiffs

18   danger and detriment.

19                         **SECOND CAUSE OF ACTION**

20                  (Negligence Per Se Against Defendants -All Defendants)

21   69.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

22   through 68, inclusive, and incorporate them herein by reference, as if filly set forth herein.

23   70.     As actual owners and/or operators of the facility at the Site, all Defendants

24   violated provisions of *California Health & Safety Code* §5411, which provides that:  "No person

25   shall discharge sewage or other waste, or the effluent of treated sewage or other waste; in any

26   manner which will result in contamination, pollution or a nuisance."

27

28                                      -18-

71.    Defendants further violated the provisions of California Water Code §13000 et seq., in particular §13050 which provides that, "No person shall discharge sewage or other waste or the effluent of treated sewage or other waste, in any manner which will result in contamination, pollution or a nuisance." As defined by *California Water Code §13050(k)*, Defendants have contaminated the quality of the waters by their improper disposal of hexavalent Chromium, Trivalent Chromium, chromium compounds, CVOCs, and other toxic substances.

72.    *California Water Code* §13376 provides in pertinent part that "[a]ny person discharging pollutants or proposing to discharge pollutants to the navigable waters of the United States. . .or any person discharging dredged or fill material into the navigable waters of the United States.. . shall file a report of the discharge in compliance with the procedures set forth in § 13260, except that no report need be filed under this section for discharges that are not subject to the permit application requirement of the Federal Water Pollution Control Act, as amended. Any person proposing to discharge pollutants...shall file a report at least 180 days in advance of the date on which it is desired to commence the discharge of pollutants.

73.    Plaintiffs are informed and believe and thereon allege that Defendants did not and have not immediately reported the release of certain hazardous chemicals nor did they immediately report the threatened or actual release of any or certain chemicals to navigable waters.

74.    On information and belief the Defendants named in this cause of action did not and have not filed a report of proposed discharges to navigable waters relating to the migration and seepage of toxic substances from the Site to such waters.

75.    The violation of California Health & Safety Codes §§5411, 25249.5 and California Water Code §l3000 et seq., including §13376, by Defendants has proximately caused trespass and nuisance to Plaintiffs' property and possessory interest, and caused their personal injuries.

76.    California Health & Safety Codes §§54ll, 25249.5 and California Water Code

-19-

1 §§13000 et seq. were intended to prevent this type of injury to Plaintiff and to their property, and

2 Plaintiffs are members of the class of persons for whose protection the statute was adopted.

3       77.    As a proximate result of Defendants' violation of the statutes, Plaintiffs have

4 suffered and will continue to suffer from great, physical, mental and nervous pain and suffering,

5 including fear of cancer.  Plaintiffs are informed and believe and thereon allege that they will be

6 compelled to seek further treatment in the future for care of said injuries and to incur further

7 reasonable bills for the same.

8       78.    Defendants' non-compliance with said environmental statutes is Negligence Per-

9 Se. Plaintiffs have suffered great and irreparable harm. Defendants' wrongful conduct was

10 knowing and deliberate, and defendants acted with conscious and reckless disregard for the

11 hazards and threats to Plaintiffs.   Plaintiffs are therefore entitled to recover punitive or

12 exemplary damages from Defendants.

13 **THIRD CAUSE OF ACTION**

14 (Intentional Infliction of Emotional Distress - All Defendants)

15       79.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

16 through 78 of the preceding paragraphs with 'the same force and effect as if same were set forth

17 at length herein.

18       80.    By intentionally and knowingly failing to take necessary measures and actions to

19 maintain and keep the site from hazardous substances and chemicals that contaminated the soil

20 and groundwater at the site and properties in the vicinity, notwithstanding the fact that

21 Defendants had been placed on notice by both by various public agencies (City of Willits, County

22 of Mendocino, State of California and the United States) the Defendants have continued to

23 subject Plaintiffs to exposure of the hazardous substances. Such intentional and knowing conduct

24 constitutes willful disregard for the health, safety and welfare of the Plaintiffs.

25       81.    As direct and proximate cause of defendants' intentional wrongdoing Plaintiffs

26 have been exposed to hazardous substances which has caused or will cause them to suffer or

27

28

1  contract permanent injuries to their bodies, brains and nervous systems, displacement from their

2  homes, loss of family association and care, severe physical pain and suffering and mental

3  distress, and other injuries to Plaintiffs' danger and detriment.

4      82.    Plaintiffs suffered severe emotional distress due to Defendants intentional conduct

5  in discharging, releasing. threatening to discharge, and failure to clean a known contaminated

6  site.

7      83.    Defendants acted with the intent to cause Plaintiffs emotional harm or in

8  conscious disregard of Plaintiffs' emotional well being and rights, and in fact, caused Plaintiffs

9  harm, anxiety and worry.

10     84.    As direct proximate result of the aforementioned conduct of Defendants, Plaintiffs

11  have suffered and continues to suffer severe anxiety, worry, mental and emotional distress. These

12  actions of Defendants were done with malice, oppression and fraud towards Plaintiffs, and were

13  willful and wanton, justifying the imposition of punitive damages.

14                              **FOURTH CAUSE OF ACTION**

15                  (Negligence Causing Fear Of Cancer or Other Injury - All Defendants)

16     85.    Plaintiffs repeat and reallege paragraphs 1 through 84 above as if fully set forth

17  herein.

18     86.    Defendants owed a duty to Plaintiffs to not contaminate the soil and groundwater.

19     87.    Defendants breached their duty to Plaintiffs when they allowed the soil and

20  groundwater at the site and vicinity to be contaminated.

21     88.    Defendants' breach of their duty to Plaintiffs directly and proximately caused

22  Plaintiffs to suffer severe emotional distress based on fear of cancer or other injury due to their

23  negligence.

24                               **FIFTH CAUSE OF ACTION**

25                            (Strict Liability -- All Defendants)

26     89.    Plaintiffs repeat and reallege each and every allegation of all preceding paragraphs

27

28                                        -21-

1  and incorporate them by reference as tough they were set forth herein.

2      90.   In doing the acts herein alleged; the Defendants named in this cause of action

3  created a hazardous condition on their property and were engaged in hazardous activities for

4  which they were strictly liable under the laws of the State of California.

5      91.   As a direct and proximate result of the willful and reckless disregard for the safety

6  of others on the pan of the defendants named in this cause of action, Plaintiffs have suffered and

7  continue to suffer injury to their persons and damages to their property.

8  **SIXTH CAUSE OF ACTION**

9  (Nuisance -- All Defendants)

10      92.   Plaintiffs repeat and reallege each and every allegation of all preceding paragraphs

11  and incorporate them by reference as tough they were set forth herein.

12      93.   In doing the acts herein alleged; the Defendants named in this cause of action

13  created a hazardous condition on their property and were engaged in hazardous activities for

14  which constitutes a private nuisance to these plaintiffs under the laws of the State of California.

15  Due to their exposure to the toxic chemicals described in this complaint, Plaintiffs have suffered

16  particularized injuries to their persons and to the real property that they held or presently hold an

17  interest in.

18      94.   As a direct and proximate result of the willful and reckless disregard for the safety

19  of others on the part of the defendants named in this cause of action, Plaintiffs have suffered and

20  continue to suffer injury to their persons and damages to their property.

21  **SEVENTH CAUSE OF ACTION**

22  (Fraudulent Concealment–All Defendants)

23      95.  Plaintiffs repeat and reallege paragraphs 1 through 94  above as if fully set forth

24  herein.

25      96.  Plaintiffs are informed and believe and thereon allege that Defendants named in

26  this cause of action have concealed and continue to conceal from Plaintiffs and government

27

28      -22-

1    agencies the true extent and risk associated with the contamination of the soil and groundwater.

2         97.    Plaintiffs are informed and believe and thereon allege that Defendants in this

3    cause of action knew or reasonably should have known of the discharges and released from their

4    operation have passed and continue to pass into the soil, groundwater, and drinking water of the

5    State of California.   In addition,

6              (A) Defendant Whitman - now owned by Defendant Pepsi Americas -  knew that

7    the Plaintiff Leland J. Chalmers, Jr. had suffered a work-related injury,

8              (B) The employer concealed that knowledge of the causal relationship between

9    these reactions and the hazardous properties of the chemicals that caused these reactions; and

10             (C) Plaintiff Chalmers' injuries were  aggravated as a result of such concealment,

11   and Defendant Whitman is  liable for this aggravation.

12                          **EIGHTH CAUSE OF ACTION**

13                        (Gross Negligence – All Defendants )

14        98.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

15   through 97, inclusive, and incorporate them herein by reference, as if fully set forth herein.

16        99.    Each of the above and foregoing acts or omissions of Defendants was more than

17   momentary thoughtlessness, inadvertence, or error of judgment. Such acts or omissions

18   constituted such an entire want of care as to establish that they were the result of actual conscious

19   indifference to the rights, welfare or safety of the Plaintiffs and persons affected by it, and as

20   such constitute gross negligence.

21        100.    As a direct and proximate result of Defendants' grossly negligent acts and/or

22   inactions in exposing Plaintiffs to toxic chemicals, Plaintiffs have suffered, among other things,

23   property damage, personal injuries, emotional distress and even death.

24        101.    In addition to damages for the foregoing, Plaintiffs are also entitled to recover

25   judgment against Defendants for exemplary damages for such gross negligence, heedless and

26   reckless disregard to Plaintiffs rights.

27

28                                    -23-

**NINTH CAUSE OF ACTION**

(Loss of Consortium —All Defendants)

102.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 101, inclusive, and incorporate them herein by reference, as fully set forth herein.

103.    Plaintiffs have suffered a loss of consortium as a result of their exposure to the Remco chemicals.

104.    Plaintiffs reserve the right to amend this complaint to include further consortium claims upon further discovery.

105.    Defendants, and each of them, intentionally or negligently inflicted serious disabling injuries on Plaintiffs through exposure to dioxin, arsenic, Hexavalent Chromium, cadmium, chloroform, 1,1- Dichloroethane, lead, Polychlorinated Biphenyls (PCBs), Vinyl Chloride, Tetrachloroethane, and Trichloroethene, among others, which toxic contamination caused substantial injuries as stated above.

106.    As a direct and proximate result of Defendants' conduct and by reason of the injuries described herein Plaintiffs have been deprived of the care, comfort, protection, society, support, services and consortium, thereby suffering general damages according to proof

**TENTH CAUSE OF ACTION**

(Battery — All Defendants)

107.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 106, inclusive, and incorporate them herein by reference, as if fully set forth herein.

108.    Defendants operation, manufacturing, dumping and/or attempts at remediation at and around the Site, including their use, storage and disposal of toxic chemicals, all constituted intentional acts.

109.    Plaintiffs' inhalation, exposure and ingestion of toxic substances resulting from Defendants' actions through Plaintiffs' exposure to the contaminated surface and subsurface soil,

1    atmosphere and environment constituted harmful and offensive contacts by Defendants and each

2    of them.

3      110.    Plaintiffs did not consent to these harmful and offensive contacts caused by

4    Defendants.

5      111.    As a result of the intentional discharge of the toxic substances described herein,

6    by Defendants into the atmosphere and environment, Plaintiffs were damaged not only by

7    physical injury but also Plaintiffs have suffered emotional distress and or an increased risk of

8    disease.

9      112.    Defendants' intentional conduct in exposing Plaintiffs to toxic substances through

10    the atmosphere, soil and environment caused harmful and offensive contacts by inhalation and

11    ingestion of the contaminated groundwater, contamination in the surface and subsurface soil,

12    atmosphere and environment. Such contacts were willful, malicious, and intentional from which

13    the Plaintiffs have suffered great harm, justifying an award of exemplary damages.

14

15                    **ELEVENTH CAUSE OF ACTION**

16                    (Toxic Trespass – all Defendants)

17      113.    P1aintiffs repeat and reallege each and every allegation contained in paragraphs 1

18    through 112, inclusive, and incorporate them herein by reference, as if fully set forth herein.

19      114.    Defendants' acts, as alleged herein, constitute an unpermitted intrusion on

20    Plaintiffs' possessory interest in land by toxic materials.

21      115.    Said intrusion was avoidable, negligent, or, in the alternative, intentional.

22      116.    Defendants' improper use, storage, disposal and remediation of toxic chemicals

23    has resulted in these toxic emissions and contaminated groundwater entering and penetrating into

24    Plaintiffs' properties, including, but not limited to, homes, grounds, water supply and vegetation.

25

26

27

28                                 -25-

117.    These toxic emissions and contaminated groundwater have dispersed and continue to penetrate Plaintiffs' properties, including, but not limited to, Plaintiffs' homes, grounds, water supply and vegetation.

118.    As a proximate result of the toxic trespasses committed by the Defendants, Plaintiffs have been injured, their possessory interest in land has been affected, and their possessory interest in their land has been devalued. All of the above damages will be established according to proof.


### TWELFTH CAUSE OF ACTION
#### (Willful Misconduct - All Defendants)

119.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 120 inclusive, and incorporate each paragraph herein by reference, as if fully set forth.

121.    During the times that they owned and operated the plant, Defendants Whitman and Pneumo Abex engaged in conduct with express or implied knowledge that serious injury to anyone or any real property in the vicinity of the Remco site was a probable result of their activities that caused contamination.  Alternatively, they intentionally conducted their activities with a wanton and reckless disregard of its consequences.  In either instance, it differs from negligence in that it does involve an intention to perform an act that the actor knows, or should know, will very probably cause harm.

122.    Defendants have breached said duty by failing to exercise reasonable care in the course of said conduct.

123.    It is reasonably foreseeable that Plaintiffs would be damaged by Defendants' breach.

### THIRTEENTH CAUSE OF ACTION

#### (Malicious Toxic Contamination- All Defendants)

124.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 inclusive, and incorporate each paragraph herein by reference, as if fully set forth.

125.    During the time period set forth in this complaint, these Plaintiffs were part of a class of persons who were to be protected from toxic contamination by the environmental laws of the state of California. Defendants' flagrant and willful violation of environmental laws and regulations designed to protect human health provide the impetus for the recognition of the tort of malicious toxic contamination, as discussed by California Supreme Court Justice Joyce Kennard in *Potter,* 6 Cal. 4th 1015-1019 and the Restatement of Torts, 2nd, Section 874A.

126.    The named Defendants have breached said duty by failing to exercise reasonable care as fully alleged herein, and that by engaging in such conduct in a malicious manner.

127.    It is reasonably foreseeable that Plaintiffs would be damaged by Defendants' breach.

WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

1.    For general and special damages in an amount as shall be proven at the time of trial in a sum according to proof;

2.    For punitive and exemplary damages;

3.    For contribution damages and/or restitution, for past and future response costs, including reasonable attorneys' fees, expert witness' fees, oversight costs and interest incurred by Plaintiffs to investigate and remediate the contamination at and round the Site, in an amount to be proven at trial;

4.    For a judicial declaration that all Defendants, and each of them, are liable for future response costs including reasonable attorney fees, expert witness' fees, oversight costs and interest incurred by Plaintiffs to investigate and remediate the contamination at and around the Site;

-27-

5.      For a judicial declaration that Defendants caused the contamination and are liable for its total remediation;

6.      For a judicial determination that Defendants are legally obliged to indemnify, defend and hold Plaintiffs harmless from any and all claims arising from the contamination at and around the Site;

7.      For attorney fees;

8.      For costs of suit incurred herein;

9.      For prejudgment interest according to proof;

10.     For injunctive relief to fully abate the existing nuisance;

11.     For such other and further relief as this Court may deem just and proper.

Dated:   May 31, 2008

_____
Tesfaye W. Tsadik, Esq.
William M. Simpich, Esq.
Attorneys for Plaintiffs

-28-