IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRY WHITLOCK, *et al.*, | No. C 08-02742 SI |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS GROUNDS** |
| v. | |
| PEPSI AMERICAS, *et al.*, | |
| Defendants. | |

On October 16, 2009, the Court heard oral argument on defendants' motion for summary judgment on statute of limitations grounds. Having carefully considered the arguments of counsel and the papers submitted, the Court GRANTS in part and DENIES in part the motion for the reasons set forth below.

**BACKGROUND**

On May 30, 2008, plaintiffs filed this case alleging injuries sustained as a result of improper disposal of hazardous waste at the Remco facility located in Willits, California. Plaintiffs are residents or former residents of the city of Willits, workers at the Remco site, or associated with workers in the site or related to plaintiffs exposed to the contaminants. The complaint alleges a number of California tort claims based on hazardous waste contamination, including negligence, negligence per se, loss of consortium, nuisance, and toxic trespass. *See* Compl. ¶¶ 66-127.

Beginning in approximately 1945, various owners operated industrial machining and manufacturing businesses at the Remco facility. Defendants Pneumo Abex Corporation and Whitman Corporation are successors to the former owners and operators of the Remco plant. In 1988, one of the

defendants' predecessor companies sold Remco to MC Industries, Inc. The facility was closed in 1995 when MC Industries declared bankruptcy. In 2000, the assets and liabilities of Pneumo Abex and Whitman were purchased by defendant Pepsi Americas.

The present case is the latest in a series of cases arising out of contamination at the Remco facility. In 1996, the City of Willits filed a lawsuit in this Court alleging that the Remco site was contaminated and sought an order requiring current and former owners to investigate and remediate the site. *See People of the State of California and the City of Willits v. Remco Hydraulics, et al.,* C 96-283 SI. The parties entered into a consent decree in August 1997. Under the Consent Decree, the Court established the Willits Environmental Remediation Trust ("Willits Trust"). Remediation of the Remco site began in 1997, and since that time the Willits Trust had overseen many large-scale efforts including an investigation for areas of potential concern, thousands of groundwater, soil, vegetation, and air samples, and an extensive remediation campaign.

In 1999, 2001, and 2006, three separate toxic tort actions were filed alleging personal injury and property damage claims as a result of exposure to Remco contaminants. *See Avila, et al. v. Willits Environmental Remediation Trust, et al.*, C 99-3941 SI; *Abbott et al. v. Willits Environmental Remediation Trust, et al.*, C 01-266 SI; *Nickerman, et al. v. Remco Hydraulics, Inc., et al.*, C 06-2555 SI. The three cases were consolidated in this Court, and originally involved approximately 1000 plaintiffs. Ultimately all of these claims were settled, dismissed, or lost on summary judgment.

Now before the Court is defendants' motion for summary judgment on all claims for personal injury and property damage brought by plaintiffs Leland Chalmers, Melissa Anastasiou Dalton, Alvin Ford, Daniel Ford, Linda Ford, Melinda Ford, Timothy Ford, Tracy Ford, Juanita Shumaker, Danielle Smith, JoAnn Wakeland, and Harry Whitlock on the ground that these claims are barred by the applicable statute of limitations. Defendants contend that the claims of these 12 plaintiffs accrued outside of the relevant statute of limitations under the traditional rule, and that none of them can meet the burden of proving that their claims were timely filed pursuant to the discovery rule.

**LEGAL STANDARD**

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories,

2

and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T. W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T. W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Defendants contend that the claims of the 12 plaintiffs subject to this motion are barred by the applicable statute of limitations. Plaintiffs do not dispute that their claims accrued many years ago under California's "traditional" rule, which states that California's statutes of limitations ordinarily begin to run upon the occurrence of the last element essential to the cause of action. *See Norgart v.Upjohn Co.*, 981 P.2d 79, 88 (1999). However, plaintiffs argue that the discovery rule postpones the accrual of this action until the time when plaintiffs discovered, or had reason to discover, the health dangers posed to them by the Remco site. Plaintiffs contend that their claims are timely because plaintiffs only recently discovered the cause of their injuries. Defendants respond that the claims of the 12 plaintiffs are time-barred because they knew or should have known the basis for their personal injury and property damage claims well before the applicable limitations periods.

3

## I. Applicable discovery rule

The parties agree that the statute of limitations for plaintiffs' personal injury claims is two years, and that the statute of limitations for plaintiffs' nuisance and trespass claims is three years. Cal Civ. Proc. Code §§ 340.8, 338(b). However, they dispute whether the Court should apply federal or state law (or both) regarding when plaintiffs' causes of action accrued, triggering commencement of the statute of limitations. "Under California law, a plaintiff discovers a claim when the plaintiff 'suspects or should suspect that her injury was caused by wrongdoing.' By its terms, [CERCLA][1] sets a later date for commencement of the limitations period, tolling the start of the period for filing claims beyond the date that a plaintiff suspects the cause of injury until the time that he or she knows or reasonably should have known of that cause." *O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1147-48 (9th Cir. 2002) (quoting *Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 927 (Cal. 1988)). *O'Connor* holds that "because the federal standard under CERCLA is more generous than California law in tolling the statute of limitations when a plaintiff's discovery of her claims is delayed, the federal commencement date preempts California's discovery rule." *Id.* at 1147.

Plaintiffs contend that both CERCLA and California's discovery rules should govern their claims. Plaintiffs note that, after the *O'Connor* decision, the California legislature enacted California Code of Civil Procedure section 340.8, clarifying California's discovery rule for personal injury and wrongful death claims related to toxic exposure. Section 340.8 states:

> [T]he time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later.

Cal Civ. Proc. Code § 340.8(a); *see also* subsec. (b) (providing parallel discovery rule in wrongful death actions arising from exposure to hazardous material or toxic substance). As between state and federal law, the Court must apply the more generous standard, not both. *See O'Connor*, 311 F.3d at 1146-47. Therefore, the relevant inquiry is whether the California standard under section 340.8 is more generous than the federal standard under CERCLA.

---

[1] CERCLA is the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq.

4

The Court finds that section 340.8 commences the limitation period earlier than the federal standard and is therefore preempted by CERCLA. The fact that this legislation followed *O'Connor* does not reflect an intent to codify the principles articulated in *O'Connor*, as suggested by plaintiffs. Indeed, defendants correctly note that the legislative history of California Code of Civil Procedure section 340.8 explicitly states that the legislature intended to codify the state court rulings in *Jolly v. Eli Lilly & Co.*, 751 P.2d 923 (Cal. 1988), *Norgart v. Upjohn Co.*, 981 P.2d 79 (Cal. 1999), and *Clark v. Baxter HealthCare Corp.*, 100 Cal. Rptr. 2d 223 (Cal. Ct. App. 2000). These cases hold that a plaintiff discovers a cause of action when he is on inquiry notice, defined as reason to suspect a factual basis for a cause of action, rather than actual knowledge thereof. *Jolly,* 751 P.2d at 927-28; *Norgart*, 981 P.2d at 88; *Clark*, 100 Cal. Rptr at 231. In *Nogart*, the California Supreme Court explicitly rejected the notion that "a plaintiff must do more than suspect a factual basis for the elements of a cause of action." *Nogart*, 981 P.2d at 97 n.8. By contrast, "the federal standard requires more than suspicion alone." O'Connor, 311 F.3d at 1148. Therefore, because California's discovery rule is less generous than the federal standard under CERCLA, the Court concludes that the federal standard applies here.[2]

## II. Analysis under the discovery rule

Plaintiffs have the burden of burden of proving that they have satisfied the requirements of the discovery rule. *See O'Connor*, 311 F.3d at 1150. Summary judgment on this question is improper unless the only reasonable inference that can be drawn is that the 12 plaintiffs knew or should have known more than two years (or in the case of property damage claims, three years) before filing their claims that the Remco contamination was the cause of their alleged injuries. *Id.* (citing *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000).

---

[2] Plaintiffs note that California Code of Civil Procedure section 340.8(c)(2) states that "[m]edia reports regarding the hazardous material or toxic substance contamination do not, in and of themselves, constitute sufficient facts to put a reasonable person on inquiry notice . . . ." This provision does not make California's standard more generous than the federal standard because media reports, in and of themselves, are not sufficient to place plaintiffs on inquiry notice under CERCLA either. *See O'Connor*, 311 F.3d at 1152-54.

5

### A. Inquiry Notice

Under CERCLA's delayed discovery rule, the Court must engage in a two-part analysis to determine whether plaintiffs reasonably should have known of their claim.

> The goal of this analysis is to evaluate when a reasonable person would have connected his or her symptoms to their alleged cause. First, we consider whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause of his or her injury. Second, if the plaintiff was on inquiry notice, we must next determine whether [an inquiry] would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim. The plaintiff will be charged with knowledge of facts that he would have discovered through inquiry.

*O'Connor*, 311 F.3d at 1150 (internal citations and quotations omitted).

Defendants cite a number of events they contend should have put plaintiffs on inquiry notice of the cause of their injuries. First, defendants point to hundreds of newspaper articles in *The Willits News*, *The Ukiah Daily Journal*, and *The Press Democrat*, beginning as early as 1979, that discussed the Remco contamination, the cleanup, and possible health risks. *See* Newspaper Appendix [Docket Nos. 42-1 – 42-16]. Additionally, many Willits residents were individually warned about the exposure to the Remco contamination through various notices that went out to specific residences. *See* Raushenbush Decl., ex. 20, 24, 29, 32 [Docket No. 41-3, 41-2]; Newspaper Appendix, ex. 42 [Docket No. 42-3]; Linker Decl., ex. 77 [Docket No. 41-9]. Moreover, many surveys and interviews were conducted in the community to investigate the potential health effects of the Remco contamination. *See* Linker Decl, ex. 21-22 [Docket Nos. 41-7 – 41-8]. Between December 1999 and January 2000 and between April and December of 2000, private investigator Lew Dunn and the Robins Kaplan law firm interviewed Willits residents regarding their interest in a potential toxic tort lawsuit.[3] *See* Linker Decl., ex. 42-43 [Docket No. 41-8]. In August, 2000, Erin Brockovich, of the eponymous Hollywood film, came to Willits for a meeting with over 100 residents to discuss Remco contamination. Newspaper Appendix, ex. 189 [Docket No. 42-12]. At the same meeting, attorney William Simpich was quoted as stating: "This is the time to strike, seriously. Because in two weeks it will have been a year from the day we filed. The day of reckoning is coming nigh" *Id.*

---

[3] Defendants contend that plaintiff Melissa Anastasiou Dalton was among the residents interviewed. Ms. Dalton testified that she does not recall an interview with either the private investigator or the law firm. Dalton Depo., 42:1-44:19 [Docket No. 48]. See discussion of Ms. Dalton's actual knowledge *infra*.

Defendants also argue that plaintiffs were put on notice based on highly publicized lawsuits regarding the Remco contamination. Pursuant to the consent decree in *People v. Remco*, the Willits Trust established a document depository at the Willits Library in order to make documents relating to the Remco contamination available to the community. *See* Linker Decl., ex. 3, 13 [Docket Nos. 41-5 – 41-7]. Also, public notices were issued and hearings were held to inform the public about the contamination and remedial efforts. *See* Newspaper Appendix, ex. 43-54, 56-57 [Docket Nos. 42-3 – 42-5]; Raushenbush Decl., ex. 27 [Docket No. 41-3]. The Willits Trust also established a community hotline for information and distributed fact sheets regarding the contamination investigation beginning in June 1998. *See* Newspaper Appendix, ex. 70 [Docket No. 42-5]; Linker Decl., ex. 74 [Docket No. 41-9]; Watson Decl., ex. 19 [Docket No. 41-10]. The Remco contamination also made headlines in November and December of 1997 when the City filed a lawsuit against Remco insurers to recover money to fund cleanup efforts. *See* Newspaper Appendix, ex. 38-39 [Docket Nos. 42-2 – 42-3].

Subsequently, several toxic tort lawsuits were filed alleging Remco-related injuries to local residents. In August 1998 and September 1999, the newspaper reported a wrongful death suit filed by the parents of Forrest Hernandez alleging that their son's death was caused by the Remco contamination. *See* Newspaper Appendix, ex. 35, 77 [Docket Nos. 42-2, 42-5]. There were also newspaper articles, public notices, and meetings about the *Avila* lawsuit filed on August 23, 1999. *See Avila*, 99-3941 SI; Newspaper Appendix, ex. 77-84, 87-91, 106, 110 [Docket Nos. 42-5 – 42-6, 42-7]. On July 21st and 23rd of 1999, shortly before the complaint was filed, newspapers ran public notices inviting "[a]nyone with personal injury or property claim[s]" to attend a meeting on July 24, 1999 regarding Remco. *See* Newspaper Appendix, ex. 72-73 [Docket No. 42-5]. A related action was filed in January 2001, *Abbott*, C 01-266 SI, and a third related action was removed to this Court in 2006, *Nickerman*, C 06-2555 SI.

Defendants contend that since all 12 plaintiffs lived in Willits or the immediate surrounding area during the period when the Remco contamination was highly publicized, they should have known about their claims long before they claim to have discovered them. In opposition, plaintiffs point to their deposition testimony indicating that they had not been exposed to the publicity surrounding Remco and only learned of their claims during the two years prior to the filing of their complaint. Some plaintiffs testified that they had not heard of Remco prior to filing this action. *See* Tracy Ford Depo., 48:23-49:22

7

[Docket No. 54]; Smith Depo., 28:3-29:22 [Docket No. 56]; Whitlock Depo., 36:25-37:5 [Docket No. 58]. Many testified that they did not read or subscribe to any Willits area newspapers or attend any public meetings or hearings. *See* Chalmers Depo., 78:19-79:13, 84:2-5 [Docket No. 47]; Dalton Depo., 93:1-94:1 [Docket No. 48]; Alvin Ford Depo., 58:9-20, 59:5-9 [Docket No. 49]; Daniel Ford Depo., 33:18-34:9 [Docket No. 50]; Linda Ford Depo., 54:11-55:13, 59:16-21 [Docket No. 51]; Melinda Ford Depo., 49:15-17 [Docket No. 52]; Timothy Ford Depo., 55:23-58:24 [Docket No. 53]; Tracy Ford Depo., 70:5-7, 71:5-25 [Docket No. 54]; Smith Depo., 53:23-56:20 [Docket No. 56]; Wakeland Depo., 71:20-23, 72:13-22 [Docket No. 57]. Plaintiffs, including members of the Ford family, also testified that they had not heard of any prior lawsuits or only learned about them recently. Chalmers Depo., 69:6-9; Alvin Ford Depo., 17:3-25; Linda Ford Depo., 55:23-56:1; Melinda Ford Depo., 38:22-29:14; Timothy Ford Depo., 45:8-10; Tracy Ford, 60:21-23; Shumaker Depo., 57:10-14; Smith Depo., 60:21-23.

Although none of the sources cited by defendants, by itself, would be enough to impute knowledge to the plaintiffs, in the aggregate they show that there was a great deal of information throughout the Willits community and beyond concerning potential danger from the Remco contamination. The combined amount of information, particularly involving the prior lawsuits, suggests that the plaintiffs could or should have known about the Remco contamination and the associated health risks. The conclusory statements from the plaintiffs in their deposition testimony are not sufficient to prove that they neither knew nor had reason to know that their injuries were caused by the Remco contamination.

However, the standard on summary judgment is whether "the *only* reasonable inference" to be drawn is that the plaintiffs knew or should have known that their injuries were caused by the Remco facility. The record must "lead inexorably to a single inference that plaintiffs knew or suspected the cause of their injuries" outside the applicable limitations period. *O'Connor*, 311 F.3d at 1150. Here, with the exception of plaintiff Melissa Dalton, discussion *infra*, it is at least plausible that the plaintiffs remained unaware of the health risks caused by the contamination for a long period of time, particularly if they did not hear about it in the media. Although there was widespread publicity of Remco-related contamination, plaintiffs testified that they were not exposed to this publicity. The Court cannot make

credibility determinations at the summary judgment stage, and must draw all inferences in the light most favorable to the plaintiffs since they are the non-moving party.

Furthermore, in *O'Connor*, the Ninth Circuit held that whether substantial public coverage puts plaintiffs on inquiry notice is a question for the jury. It found that the lower court erred in (1) making a factual finding that news coverage was so substantial that a reasonable person could not have avoided learning about the issue, and (2) concluding that the only reasonable inference to be drawn from that publicity is that plaintiffs should have suspected a connection between the contamination and their injuries. The Court stated:

> [A] fact-intensive examination of the geographic scope of the circulation of various publications, the level of saturation of each publication within the relevant communities, the frequency with which articles . . . appeared in each publication, the prominence of those articles within the publication, and the likelihood that a reasonable person living in Plaintiffs' . . . communities at the same time as Plaintiffs would have read such articles . . . are all factual questions unsuitable for summary judgment.

*O'Connor*, 311 F.3d at 1152. Therefore, this Court concludes that genuine issues of material fact preclude summary judgment on the ground that plaintiffs should have known the cause of their injuries based on widespread publicity.[4]

### B.     Actual Knowledge

Defendants further allege that some of the 12 plaintiffs had actual knowledge of the potential link between Remco and their alleged injuries several years earlier than plaintiffs claim to have discovered the link. First, defendants claim that plaintiff Melissa Anastasiou Dalton cannot credibly claim she had no knowledge that her injuries could be linked to Remco because prior to two years before her claim was filed, she was interviewed twice for the purpose of discussing whether her injuries could be related to the Remco contamination. Defendants submit logs of privileged documents prepared by the plaintiffs in *Avila*, which list the following documents protected by the attorney work product doctrine or the attorney-client privilege, or both: (1) a tape of an interview that Lewis Dunn conducted

---

[4] As an alternative, plaintiffs request leave to amend their complaint to plead the elements of an equitable estoppel claim based on fraudulent concealment. The record does not support equitable tolling of the statutes of limitations on these grounds.

9

of "Melissa Anastacio"[5] at some point between September 1999 and April 2001,and (2) an internal memo titled "Potential Client Interview - Melissa Anastacio" that was authored by the administrative staff of Robins Kaplan law firm. Document Logs, Ex. 42-43 [Docket No. 41-8]. However, in her deposition, Ms. Dalton testified that she had never heard of Robins Kaplan and had never spoken to someone by the name of Lew Dunn. Dalton Depo., 42:6-9, 44:16-19 [Docket No. 48]. When she was presented with the document logs from *Avila* and asked whether there was any chance she talked to someone ten years ago about Remco, she stated that she did not recall. *Id.* at 47:2-20.

Summary judgment is improper where there is a material fact in genuine dispute. *See* Federal Rule of Civil Procedure 56(c). However, "if the opposition evidence is merely colorable or not significantly probative, summary judgment may be granted." *Schwarzer et al., Federal Civil Procedure Before Trial* § 14:246 (2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). Here, Ms. Dalton's testimony indicating that she is unfamiliar with Robins Kaplan and Lew Dunn is not significantly probative of whether or not Ms. Dalton was actually interviewed. Furthermore, her equivocal testimony stating that she does not recall whether she spoke to someone about Remco ten years earlier is not sufficient to dispute defendant's evidence. Since she does not expressly deny that she discussed Remco with someone many years ago, the Court finds that the only reasonable inference to be drawn from the evidence is that she was interviewed about her Remco-related injuries ten years ago, and therefore should have known the cause of her injuries. Accordingly, summary judgment is GRANTED as to Ms. Dalton.

Second, defendants argue that several members of the Ford family had actual knowledge of the link between Remco and their injuries long before the filing of the complaint. In her deposition, Linda Ford testified that in 1998, when Alvin Ford's father passed away, Alvin's sister asked the family, "Could this have something to do with the Remco thing?" Linda Ford Depo., 69:12-17 [Docket No. 51]. Linda Ford further testified, "Nobody said anything after that . . . so I just assumed it was something personal with them. I didn't know. I didn't know what was going on with them." *Id.* at 70:23-71:2.

---

[5]The document lists the name "Anastacio," whereas Ms. Dalton spells her name as "Anastasiou." However, defendants state that public searches revealed that a "Melissa Anastacio" has never lived in Willits and Ms. Dalton admits she previously lived in Willits. Therefore, the Court concludes that this is simply an inadvertent misspelling.

Additionally, when Linda completed a questionnaire on behalf of Alvin Ford, she wrote: "I heard about the Remco business around the time that Dad died because he died from lung & prostate cancer. I forgot about it until around February or March 2008 when my sister told me about it." *Id.* at 68:7-69:5. Defendants argue that this testimony indicates that Linda Ford and Alvin Ford were aware of the causes of their injuries earlier than they now claim. Plaintiffs do not dispute that Alvin's sister made this comment. However, they rebut that they did not have information at the time that they were exposed to Remco chemicals and that these chemicals caused their diseases.

Since there is a genuine dispute of fact as to whether Linda and Alvin Ford had actual knowledge, the relevant inquiry at this stage is whether plaintiffs should have known the cause of their injuries as a matter of law. The federal standard requires more than mere suspicion. *O'Connor*, 311 F.3d at 1148. Therefore, that plaintiffs had a reasonable suspicion that Remco caused their injuries is not a sufficient basis for ruling as a matter of law that they reasonably should have known that their injuries were caused by Remco. *See Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 206 (2nd Cir. 2002). The testimony indicates that Alvin Ford's sister simply posited a question about whether Remco could have something to do with the father's sickness. At best, the offhand remark raised a reasonable suspicion of a possible link between Remco and the father's cancer. A reasonable person in Linda and Alvin Ford's position would not have been expected to inquire about the cause of their own injuries based on this single comment. Therefore, this Court finds that this testimony does not lead inexorably to the single inference that Linda and Alvin Ford should have known the cause of their injuries. Accordingly, defendants' motion for summary judgement is DENIED as to these plaintiffs.

Lastly, defendants allege that Melinda Ford (and the entire Ford family by extension) had actual knowledge of her claims. In her deposition, when asked why the family moved away from Willits to Upper Lake in 1985, she responded, "because of our sicknesses and stuff." Melinda Ford Depo., 22:7-10. She explained, "my mom has real bad asthma and she is constantly getting sick. And then I was becoming sick, constantly bloody noses and stuff like that." Defendants argue that this demonstrates that the family knew that something in Willits was causing their injuries and that the slightest investigation would have put them on notice of their claims. Plaintiffs do not respond to this argument. Melinda Ford's testimony merely indicates that plaintiffs had knowledge of their injuries, not knowledge

11

that the Remco contamination caused their injuries. Thus, the Court finds that this testimony is insufficient to show that Melinda and the rest of the Ford family had actual knowledge of the cause of their injuries, nor is it sufficient to show that they should have known the cause as a matter of law. Therefore, defendants' motion for summary judgment on these grounds is DENIED.

## CONCLUSION

For the foregoing reasons and for good cause shown, defendants' Motion for Summary Judgment on Statute of Limitations Grounds is GRANTED in part and DENIED in part. [Docket No. 40]

**IT IS SO ORDERED.**

Dated: October 21, 2009

SUSAN ILLSTON
United States District Judge