United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRY WHITLOCK, *et al.*, | No. C 08-2742 SI |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE IN PART EXPERT TESTIMONY AND MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTIONS TO EXCLUDE AS MOOT** |
| v. | |
| PEPSI AMERICAS, *et al.*, | |
| Defendants. | |

On July 1, 2011, the Court heard argument on the parties' motions to exclude expert testimony and defendants' motion for summary judgment. For the reasons set forth below, the Court GRANTS defendants' motion to exclude in part certain expert testimony and for motion summary judgment, and DENIES AS MOOT plaintiffs' motions to exclude expert testimony.

**BACKGROUND**

Twenty-nine plaintiffs filed this case on May 30, 2008. The complaint alleges claims for cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act; negligence; strict liability; intentional misrepresentation; fraudulent concealment; intentional infliction of emotional distress; negligent infliction of emotional distress; loss of consortium; and battery. Compl. ¶¶ 66-127. By stipulation of the parties, a wrongful death claim was added later. As a result of dismissals and settlements, only two plaintiffs remain: Jo Ann Wakeland and Danielle Smith.

Ms. Wakeland was born on February 29, 1964, and alleges that her gastrointestinal disease (including duodenal ulcer) and poor dentition were caused by airborne inhalation exposure to hexavalent chromium ("chrome VI"). Ms. Wakeland claims that she was exposed to chrome VI between 1971 and

1985 during the times that she visited Luna's Market, and during the times she attended Baechtel Grove School from 1975 to 1977. According to plaintiffs' expert Dr. Byers, Ms. Wakeland visited Luna's Market periodically to buy candy or have lunch while she attended Baechtel Grove School, and she also worked at or near the market during 1982-1983, and again in 1985. Ms. Wakeland also claims airborne inhalation exposure to trichloroethylene ("TCE") from 1971 to 1975 at Luna's Market, and in 1975 while she attended Baechtel Grove School. Ms. Wakeland does not allege that her current injuries were caused by exposure to TCE, but she does seek an award for future medical monitoring.

Ms. Smith was born on December 31, 1981. Ms. Smith does not claim any current injury from exposure to toxic substances, but she seeks an award for future medical monitoring. Ms. Smith claims airborne inhalation exposure to chrome VI and TCE between 1982 and 1988 when she visited Luna's Market. Ms. Smith also claims that she was exposed during 1984 at her residence on Walnut Street in Willits, approximately 500 feet south of the Remco facility.[1]

Plaintiffs rely on three experts to establish exposure and causation. Dr. O'Connor is a chemist and he opines about the maximum concentration which could have theoretically been experienced at certain times and locations in Willits. Dr. O'Connor does not offer a specific opinion or calculate a dose for either Ms. Wakeland or Ms. Smith. Dr. Sawyer is a toxicologist and opines on general and specific causation. Dr. Byers is a physician specializing in immunology and opines on specific causation with respect to whether plaintiffs experienced the injuries claimed.

## LEGAL STANDARDS

**1. Summary judgment**

Summary adjudication is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden

---

[1] Plaintiffs' opposition papers also assert that plaintiffs drank contaminated water. However, plaintiffs' experts did not attempt to quantify this exposure pathway, and they limited their opinions to airborne inhalation exposure. Tercero Decl. Ex. 4 at 75:4-24 (O'Connor Dep.); Ex. 15 at 1 (Sawyer Report); Ex. 17 at 121:20-23 (Byers Dep.). Plaintiffs' opposition papers also assert that plaintiffs were exposed to dioxins, TCA and other volatile organic compounds. However, plaintiffs' experts limited their exposure and causation opinions to chrome VI and TCE. *See id.*

of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non- moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(c)(4). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**2.    Expert testimony**

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert testimony under Rule 702 must be both relevant and reliable. *Daubert v. Merrill Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993). When considering evidence proffered under Rule 702, the trial court must act as a "gatekeeper" by making a preliminary determination that the expert's proposed testimony is reliable. *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003).

As a guide for assessing the scientific validity of expert testimony, the Supreme Court provided a nonexhaustive list of factors that courts may consider: (1) whether the theory or technique is generally accepted within a relevant scientific community, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory or technique can be tested. *Daubert*, 509 U.S. at 593-94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Ninth Circuit also has indicated that independent research, rather than research conducted for the purposes of litigation, carries with it the indicia of reliability. *See Daubert v. Merrell*

3

*Dow Pharm., Inc.*, 43 F.3d 1311,1317 (9th Cir. 1995) ("*Daubert II*"). In particular, using independent, pre-existing research "provides objective proof that the research comports with the dictates of good science" and is less likely "to have been biased by the promise of remuneration." *Id*. If the testimony is not based on independent research, the expert must explain precisely how he went about reaching his conclusions and point to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that he has followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in his field. *Id*. at 1318-19 (citing *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994)); *see also Lust v. Merrell Dow Pharmaceuticals, Inc*., 89 F.3d 594, 597 (9th Cir. 1996). The proponent of the evidence must prove its admissibility by a preponderance of proof. *See Daubert*, 509 U.S. at 593 n.10.

## DISCUSSION

**1.     Defendants' motion to exclude in part certain expert testimony and for summary judgment**

"The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a *prima facie* case." *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 402 (1985). In a toxic tort case, a plaintiff must first show that he or she was actually exposed to a toxic substance because "[i]f there has been no exposure, there is no causation." *Ferris v. Gatke Corp.*, 107 Cal. App. 4th 1211, 1220 n.4 (2003). If a plaintiff demonstrates exposure, he must then show through admissible scientific evidence that it is "more likely than not" that exposure to the toxic substances can cause his injuries (general causation), and in fact did cause his injuries (specific causation). *See Jones*, 163 Cal. App. 3d at 403 ("more likely than not" causation standard is "the outer limit of inference upon which an issue may be submitted to an jury"); *see also Golden v. CH2M Hill Hanford Grp., Inc.*, 528 F.3d 681, 683 (9th Cir. 2008) ("To survive summary judgment on a toxic tort claim for physical injuries, Golden had to show that he was exposed to chemicals that could have caused the physical injuries he complains about (general causation), and that his exposure did in fact result in those injuries (specific causation).").

4

**A.    TCE**

Both plaintiffs allege exposure to TCE, and seek an award for future medical monitoring based upon that exposure; neither plaintiff alleges that she suffers any present injury as a result of TCE exposure. TCE is a colorless liquid and was used as a solvent to clean metal parts. TCE was used at the Remco facility until 1975, when the facility switched to another degreasing solvent, 1,1,1,-tricholoroethane ("TCA").

      **i.    Pre-1976 exposure**

Plaintiffs' expert Dr. O'Connor opines that Ms. Wakeland was exposed to TCE between 1971 and 1975. Tercero Decl. Ex. 14 at 14 (O'Connor Report).[2] Dr. O'Connor's opinion about TCE exposure is based on extrapolating an Agency for Toxic Substances and Disease Registry ("ATSDR") model of TCA emissions for the years 1988 and 1990. *Id*. at 4-5, 7.[3] Dr. O'Connor recognizes that "no modeling was done for TCE exposures," and because of the absence of such modeling, uses the air modeling done for TCA for the years 1988 and 1990, which was based upon data reported by the Remco facility to the U.S. EPA. *Id*. at 7. Dr. O'Connor states,

> During the pre-1976 period, trichloroethylene (TCE), sometimes referred to as "Trichlor" [PPG 2005], was used extensively at the plant site as a degreasing solvent [Frey 2007; Gouber 1997]. At some period after 1975, TCE was largely replaced by 1,1,1-trichloroethane (TCA), and air modeling estimated TCA exposures in the 500-1200 $\mu g/m^3$ range for the periods 1987 and 1990 as annual averages in areas near the Remco facility. The intermediate-duration Minimal Risk Level (MRL) for TCA is 3,800 $\mu g/m^3$ [ATSDR 2006A]. Periodic peak exposures to TCA at nearby locations were much higher than annual averages, as discussed later in this report.
>
> Although no modeling was done for TCE exposures, the high levels of TCE used in the pre-1976 period, along with the comparative levels of TCE and TCA found in groundwater contaminated at the facility, suggest that air levels of TCE in the early years were, more likely than not, on the order of several hundred micrograms per cubic meter. The intermediate-duration MRL for TCE is 540 $\mu g/m^3$ [ATSDR 2009]. Periodic peak exposures to TCE at nearby locations were much higher than annual averages, as discussed later in this report.

---

[2] Ms. Smith was born in 1981.

[3] Dr. O'Connor's report, and defendants' motion, state that the ATSDR air modeling for TCA covered the years 1987 and 1990. However, the ATSDR's modeling report states that the air modeling was based on 1988 and 1990. Tercero Decl. Ex. 24 at 2 (ATSDR Report).

> The use of published MRL values, although limited in the cases of TCA and TCE to studies of adverse neurological effects, is appropriate since such values are cited by the Agency for Toxic Substances and Disease Registry as useful "Health Comparison Values" [ATSDR 2006C].
>
> In addition to inhalation exposures, persons drinking from contaminated wells near Remco [e.g., Whitlock 2010] would have ingested significant amounts of TCA, TCE, and a variety of other chlorinated hydrocarbons, many of which are impurities in and/or degradation products of TCA and/or TCE. [ATSDR 2006B]. TCE ingestion in contaminated well water would have occurred for several years after the replacement of TCE by TCA at the facility, since TCE concentrations in water tend to remain fairly stable with time [Rivett, et al 1990].
>
> The well at the Luna market area was recognized in 1991 as potentially contaminated (Exhibit E) and probably contained high levels of TCE in the early years. As late as 1994, a TCE concentration of 3,000 μg/m$^3$ was found in a well very near the Luna well site (Exhibit D).

*Id*. at 4-5. Dr. O'Connor continues,

> Exposure scenarios are more difficult [than chrome IV] to quantify for TCA and TCE. The air modeling done for 1987 and 1990 [ATSDR 2006D] relies upon data reported by the facility to the U.S. EPA in the form of Toxic Release Inventory (TRI), which uses default emission rate calculations that are rarely typical of real industrial operations – especially of the lax procedures common to the earlier years. Moreover, the Remco TRI reports are undoubtedly incorrect since they report exactly the same amounts for stack releases and fugitive releases in 1987 and again in 1990.
>
> The use of EPA default emission rates would certainly not apply to the early years during which dumping of TCE onto the asphalt near a drum storage area was a common daily practice in the 1966-1970 period [Gouber 1997]. Even in the early 1980s solvent dumping, including TCA, into an open burning pit would have released TCA vapors into the air before and during combustion [Nickerman 2006]. Accordingly, the most reliable conclusion that can be drawn from the attempts to model emissions is that annual average exposure levels of TCA were probably at least several hundred micrograms per cubic meter within areas near the Remco site, and that the same was probably true for TCE in most of the pre-1976 period.

*Id*. at 7.

Defendants raise a number of objections to Dr. O'Connor's opinion. First, they argue that there is no proper scientific basis to extrapolate the air modeling estimates for TCA for the years 1988 and 1990, to TCE emissions in 1971-1975. Defendants argue that the physical properties of TCE and TCA are fundamentally different because, *inter alia*, the evaporation rate of TCE is nearly three times lower than that of TCA. *See* Tercero Decl. Ex. 25 (TCA Material Safety Data Sheet, listing TCA evaporation rate of 12.8); Ex. 26 (Dow Chemical Co. Fact Sheet for TCE, showing TCE evaporation rate of 4.45). Thus, defendants argue, the amount of TCE used to clean an object would be much less than the amount of TCA needed to perform the same task, and the amount of TCE dispersed into the air would

6

necessarily be less.

Plaintiffs assert that Dr. O'Connor "compared the properties of both chemicals (with respect to specific gravity, weight per gallon, vapor preserve, vapor density and evaporation rates), and factored all of this into his estimate." Opp'n at 11:19-22. It is correct that Dr. O'Connor's rebuttal report compares the properties of TCA and TCE. Tercero Decl. Ex. 27 at 4. However, as defendants note, there is no explanation in Dr. O'Connor's original or rebuttal reports (or elsewhere) of how Dr. O'Connor made these calculations or how this information was scientifically factored into his modeling.

The Court finds that plaintiffs have not provided a proper scientific basis to equate TCE with TCA, nor have plaintiffs shown that it is scientifically valid to extrapolate the TCA air modeling for 1988 and 1990 to conditions decades earlier. The Court need not admit an expert opinion that is connected to the underlying data "only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). It may exclude such testimony if it determines "that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* "[T]he expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316.

Defendants also argue that even if one accepted the TCA air modeling for 1988 and 1990 as an appropriate basis for extrapolation to TCE emissions in 1971-1975, the estimated levels of TCA (and by Dr. O'Connor's extrapolation, TCE) near the Remco facility are below the 300 μg/m$^3$ level which Dr. Sawyer testified was the absolute minimum associated with any human health effect. For support, defendants cite portions of the TCA modeling report, as well as a report prepared by one of defendants' experts, David Suder, in which Mr. Suder plotted ATSDR's modeling results on a map of Willits. *See* Tercero Decl. Ex. 24 at 6-7 & 12-13 (TCA Modeling Report); Ex. 28 at 30, 15-16 & Fig. 3-1 (Suder Report).[4] According to defendants, when the TCA air modeling results are plotted on a map of Willits,

---

[4] Mr. Suder explains that "the figures presenting the modeled [TCA] concentrations in the 1,1,1-TCA Modeling report include no base map. This makes it essentially impossible for any user to find the estimated concentration at any location unless s/he is familiar with the Universal Transverse Mercator coordinate system and has the resources to plot the model results on an informative base map or aerial photograph." Tercero Decl. Ex. 28 at 15. Defense counsel requested the dispersion model

the estimated average concentration of TCA (and thus, according to plaintiffs, TCE) in the areas where Ms. Wakeland claims exposure (Luna's Market and Baechtel Grove School) did not exceed 100 μg/m$^3$. Defendants also cite the testimony of plaintiffs' expert Dr. Sawyer, in which he testified that 300 μg/m$^3$ was the lowest level of exposure associated with an immunological effect. *See* Tercero Decl. Ex. 16 at 322:8-323:21 (Sawyer Dep.).

Dr. O'Connor estimated the annual average TCE exposure scenario from 1963-1975 as "several hundred" μg/m$^3$. Tercero Decl. Ex. 14 at 7. At his deposition, Dr. O'Connor was questioned about this TCE exposure estimate:

> Q: Is that "several hundred" meaning several hundred at lower than the 539 reflected in the 1988 scenario of the TCA model?
>
> A. My belief would be it was probably less than the 589 [sic], yeah. But more than 100.
>
> Q: More than 100 but less than –
>
> A: Less than 500. And I started to tell you that's the swag, but then I would have to define that on the record. That's more of a guess than it is any actual scientific number crunching.

Tercero Decl. Ex. 4 at 128:14-14 (O'Connor Dep.). Dr. O'Connor submitted a declaration in support of plaintiffs' opposition, Simpich Decl. Ex. 5, in which he defends his use of the acronym "SWAG" ["scientific wild ass guess"], and states that his estimate was not actually "wild," but a reasonable scientific estimate based on minimal information. *See id*. at 5-6. Terminology aside, Dr. O'Connor's TCE exposure estimate of "several hundred" μg/m$^3$ in the chrome VI zones[5] does not raise a triable issue of fact because "several hundred" could be below or above the 300 μg/m$^3$ minimum injury threshold identified by Dr. Sawyer, and more importantly, the evidence in the record shows that the locations where Ms. Wakeland claims exposure fell below the 300 μg/m$^3$ level.

Plaintiffs also assert that the ATSDR air modeling report showed "Max Annual Concentration" of 539 μg/m$^3$ in 1988 and 1206 μg/m$^3$ in 1990. Tercero Decl. Ex. 24 at 6. However, as explained in Mr.

---

input files from the ATSDR investigator who did the TCA modeling, and Mr. Suder used those files to plot the TCA concentrations on an aerial photograph of Willits. *Id*. at 15-16. Plaintiffs did not challenge Mr. Suder or his report.

[5] As defendants note, Dr. O'Connor does not explain why it is appropriate to use the chrome VI isopleths from the PHA when formulating his TCE exposure opinion.

1 Suder's report, these maximum annual concentrations were modeled on the Remco property, and were
2 not off-site. Tercero Decl. Ex. 28 at 16, 28. Ms. Wakeland has not submitted any evidence that she was
3 exposed on the Remco site, nor does Ms. Wakeland claim that she was exposed on the Remco site.
4 Thus, even accepting the TCA air modeling for 1988 and 1990 as a basis for extrapolating TCE
5 emissions from 1971-1975, Ms. Wakeland has not submitted any evidence showing that she was
6 exposed to TCE at levels that her own expert, Dr. Sawyer, has testified was the absolute minimum
7 necessary for a human health effect; this is an independent ground supporting summary judgment in
8 favor of defendants.

### ii.     Exposure after 1975

Both plaintiffs claim exposure to TCE in the post-1975 time period. Plaintiffs' experts Dr. O'Connor and Dr. Sawyer admit that it is impossible to quantify the levels of TCE after the plant switched to using TCA in 1975. Dr. O'Connor stated, "I didn't attempt to even semi-quantify [TCE exposures after 1975]." Tercero Decl. Ex. 4 at 90:10-14 (O'Connor Dep.). When asked whether it was his contention that "plaintiffs were exposed to toxicologically significant levels of TCE after the facility stopped using TCE in 1975 or 1976," Dr. Sawyer answered,

> Not – not that I have sufficient evidence to quantitate dose and use to determine whether or not a condition is causally related. All I can state is that there's sufficient evidence that – on a qualitative basis that TCE levels in the air were still present at some undefined level, most likely a much lower level.

Tercero Decl. Ex. 16 at 101:1-10 (Sawyer Dep.). Dr. Sawyer also conceded that there were no TCE exposures after 1975 except possibly beginning in 1998 when remediation of the site began, causing dirt from the site to be disturbed and releasing the chemicals into the air. James Reply Decl. Ex. 7 at 101:21-102:9 (Sawyer Dep.).

In order to prevail in a toxic tort case a "a plaintiff must demonstrate 'the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." *Mitchell v. Gencorp*, 165 F.3d 778, 781 (10th Cir.1999) (internal quotation marks and citation omitted); *see also In re Bextra and Celebrex Marketing Sales Prac. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1174-75 (N.D. Cal. 2007). "[T]he

1 boundaries of allowable expert testimony are not so wide as to permit an expert testimony are not so
2 wide as to permit an expert to testify as to specific causation without having any measurements of a
3 plaintiff's exposure to the allegedly harmful substance." *Henricksen v. Conoco-Phillips Co.*, 605 F.
4 Supp. 2d 1142, 1157 (E.D. Wash. 1997).

5     Here, plaintiffs' experts have testified that they cannot quantify TCE exposure levels after 1975,
6 an admission which dooms plaintiffs' claims. As plaintiffs have no evidence that they experienced any
7 quantifiable exposure to TCE after 1975, the Court GRANTS summary judgment in favor of defendants
8 based on TCE exposure after 1975.

### B. Chrome VI

Both plaintiffs claim airborne exposure to chrome VI. Ms. Wakeland claims that her exposures from 1971 to 1985 caused her gastritis and poor dentition. Ms. Wakeland also seeks future medical monitoring based on chrome VI exposure. Ms. Smith claims that she was exposed to chrome VI between 1982 and 1988, and she seeks future medical monitoring based on that alleged exposure.

#### i. Exposure after 1975

Defendants first argue that the *de minimis* levels of chrome VI air emissions after 1975 cannot form the basis of either plaintiff's claims. Defendants cite the July 30, 2004 Public Health Assessment ("PHA") prepared by the California Department of Health Services, in which the CDHS evaluated air model data generated for three different time periods of Remco operations (1963-1975, 1976-1989, and 1990-1995). Tercero Decl. Ex. 9 at 2 (PHA). According to the PHA, the estimated airborne levels of chrome VI in the Willits community ranged between .003 to .2 $\mu g/m^3$ from 1976-1989, and .00002 to .00005 $\mu g/m^3$ for 1990-1995. *Id.*

Defendants argue that these levels are well below the injury thresholds set forth by plaintiffs' experts for Ms. Wakeland's injuries or for any other serious injury associated with chrome VI which might justify future medical monitoring. Defendants cite Dr. Sawyer's testimony, in which he testified that generally chrome VI causation for any injury can be determined to a reasonable degree of medical or toxicological certainty only where an exposure level reaches 1 $\mu g/m^3$. Tercero Decl. Ex. 16 at

10

115:15-21 (Sawyer Dep.). Dr. Sawyer also testified that the lowest level at which gastritis could occur is a "mean value of 4 microgram per cubic meter for 7.5 years," *id*. at 242:3-4, and that based on a National Institute for Occupational Safety and Health ("NIOSH") regulatory standard for workplace exposures, one microgram per cubic meter is the minimum threshold level at which poor dentition could occur. *Id*. at 298:7-299:3; Ex. 30 at 2, 49, 60 (NIOSH Hexavalent Chromium Update). Defendants argue that based upon this evidence, they are entitled to summary judgment on Ms. Smith's claims, which are based on exposure from 1982 to 1988, and on Ms. Wakeland's claims based on exposure after 1975.

In response, plaintiffs assert that "hexavalent chromium releases from 1975-1995 were likely orders of magnitude higher than estimates provided by the air model" because "there was evidence that Remco willfully operated outside the permitted time while operators knew that the air pollution control systems were not functioning." Opp'n at 15:20-16:4. In response to a public comment submitted by Latham & Watkins questioning the assumptions used in the PHA air model,[6] the CDHS responded,

> In summary, the air model and exposure assessment has been revised to reflect information not previously provided or available to CDHS. This has allowed for an even more accurate understanding of the historic plating operations at Remco as well as a more comprehensive analysis of the air modeling parameters and associated uncertainty. While the model outputs varied slightly, it did not substantially change the overall exposure picture for Willits residents. Further, ATSDR determined that hexavalent chromium releases from 1975 - 1995 were likely orders of magnitude higher than estimates produced by the air model. Thus, the potential health risk was not "greatly overestimated" as suggested by the comment; the possibility that potential health risks were underestimated is of greater concern.

PHA at 218-19 (Pl's Ex. 1).[7]

However, as defendants note, the PHA does not actually establish that the chrome VI releases from 1976-1995 were higher than the estimates produced by the PHA air model. More importantly,

---

[6] The first draft of the Public Health Assessment was released for public comment in 2003. Latham and Watkins LLP submitted comments on behalf of defendants Whitman Corporation and PepsiAmerica. *Id*. at 217. As part of the Final PHA, the CDHS considered all public comments and included a written response to each comment in the back of the report, explaining whether or not that comment resulted in any changes in the Final PHA.

[7] The Court notes that plaintiffs' opposition incorrectly cites pages 154, 156, 187 and 196 of the PHA for the assertion that chrome VI releases from 1975 to 1995 were likely orders of magnitude higher than estimates produced by the air model. The Court located the correct portion of the PHA by reading Dr. O'Connor's Rebuttal Report at 2-3.

1  plaintiffs' experts did not attempt to quantify those allegedly higher chrome VI releases, and instead
2  plaintiffs' experts expressly rely on the air modeling in the PHA in forming their opinions. The Court
3  concludes that plaintiffs have failed to raise a triable issue of fact as to whether plaintiffs' exposure to
4  chrome VI after 1975 caused any health effects, and accordingly GRANTS summary judgment in favor
5  of defendants on Ms. Smith's claims of chrome VI exposure, and Ms. Wakeland's claims of chrome VI
6  exposure after 1975.

### ii.    Ms. Wakeland's exposure from 1971-1975

Plaintiffs' experts opine that Ms. Wakeland's exposure to chrome VI between 1971 and 1975 caused her gastritis and poor dentition. Plaintiffs first rely on Dr. O'Connor's estimate of the "peak" level of exposure to chrome VI. Based on the annual averages from the PHA, Dr. O'Connor states,

> Using the NIOSH and ACGIH recommendations, one can safely conclude that no one in an area near the Remco should have been exposed to airborne chromium (VI) for even thirty minutes at a level of 5 μg/m$^3$ or more, yet reliable estimates (Exhibit C)[8] indicate levels of at least 10 μg/m$^3$ as *annual average* exposures during the years 1963-1975. The inhalation intermediate-duration (>14 days, < 365 days) Minimal Risk Levels for chromium (VI) [ATSDR 2009] are 0.3 μg/m$^3$ for particulate matter and 0.005 μg/m$^3$ for aerosol mists. Periodic peak exposures were much higher than annual average exposures, as discussed later in this report.

Tercero Decl. Ex. 14 at 4 (Dr. O'Connor's Report) (emphasis in original). Dr. O'Connor then estimated three different "exposure scenarios" for chrome VI: annual average, minimum peak, and maximum peak, for the 1963-1975 time period. *Id*. at 6-7. Dr. O'Connor states in his rebuttal report that his peak exposure estimates show "that the probability of a once-in-a-lifetime exposure [to a peak level] for at least 30 minutes was extremely likely." Tercero Decl. Ex. 27 at 3 (Dr. O'Connor Rebuttal Report). Regarding his peak exposure estimates, Dr. O'Connor testified,

> And once again, my whole point was I want you, as a medical person, to consider that its extremely likely that they [Plaintiffs] got hit with this stuff for at least 30 minutes in the time they lived in Willits. If that's inconsequential to you, I haven't helped you. If that tells you anything that you can use, then what I've done helped you.

Tercero Decl. Ex. 4 at 153:1-7 (O'Connor Dep.).

The problem with Dr. O'Connor's estimate of the "peak" level of exposure to chrome VI is that

---

[8] Exhibit C to Dr. O'Connor's Report is the Fact Sheet Summary of the PHA. Tercero Decl. Ex. 4 at Ex. C.

12

plaintiffs have provided no scientific support establishing that a once in a lifetime exposure for at least 30 minutes to a "peak level" is capable of causing Ms. Wakeland's gastritis and poor dentition. Moreover, as a factual matter, Dr. O'Connor does not provide any basis for extrapolating these peak levels of exposure to Ms. Wakeland because he has not shown that she was actually present at the exposure locations during the peak exposure times.

To establish causation for chronic gastritis, Dr. Sawyer also cites an occupational study which found that chrome platers exposed to chromic acid at a mean level of 4 μg/m$^3$ eight hours a day, five days a week, for 7.5 years, developed gastritis and duodenal ulcers. Tercero Decl. Ex. 16 at 242:3-4 (Sawyer Dep.); Ex. 31 at A-70 (Sawyer Dep. Ex. 22 (occupational study)). Defendants argue that Dr. Sawyer's causation opinion is unfounded unless plaintiffs can show that Ms. Wakeland experienced exposures that are comparable to those involved in the study. Defendants argue that plaintiffs have not and cannot make such a showing because based on Ms. Wakeland's own admissions, her exposure at Baechtel Grove Middle School in 1975 was for a few hours a day on school days, at 1 μg/m$^3$, and from 1976 to 1977 for the same duration at .07 μg/m$^3$. Tercero Decl. Ex. 14 at 13-14 (O'Connor Report); Ex. 19 at 42 (Byers Report). Ms. Wakeland's only exposure to chrome IV at over 4 μg/m$^3$ during 1971-1975 was when she went to Luna's Market one to three times a day to purchase candy or lunch. Defendants argue that even if Ms. Wakeland was buying candy or having lunch at Luna's Market for two hours a day, every day from 1971 to 1975, her daily exposure was still less than a quarter of that of the workers in the study relied upon by Dr. Sawyer, and several years short of the 7.5 year duration.

Plaintiffs respond that it was appropriate for Dr. Sawyer to rely on the occupational study of chrome platers because the chrome VI concentrations in the occupational study ranged from 1 to 20 μg/m$^3$, thus suggesting that exposures below 4 μg/m$^3$ are sufficient to cause injury. However, as defendants note, the fact that the workers in the occupational study were exposed to a range of chrome VI is irrelevant, as the study found that gastritis occurred in chrome platers "exposed to a mean breathing zone concentration of 4 μg/m$^3$ chromic acid for an average of 7.5 years." Tercero Decl. Ex. 31 at A-70. Further, Dr. Sawyer relies on the 4 μg/m$^3$ threshold to form his causation opinion, and he does not state that exposure to 1 μg/m$^3$ is sufficient to cause gastritis. "While Rule 702 does not require an expert to find a study linking the exact facts, it does require the expert demonstrate a scientifically

1    valid basis for projecting the findings of a study to the proffered casual theory." *Henricksen v. Conoco-*
2    *Phillips Co.*, 605 F. Supp. 2d 1142, 1164-65 (E.D. Wash. 2009) (in toxic tort case, striking expert where
3    he "has not provided an adequate basis for reliably linking the values derived from the circumstances
4    of [a study] to the circumstances of Henricksen's case," and granting summary judgment in favor of
5    defendant).

6    Plaintiffs also rely on another occupational study (the Gibb study), discussed in Dr. O'Connor's
7    declaration in opposition to defendants' motion for summary judgment. Pl's Ex. 5 at Ex. 1 (comparing
8    plaintiffs' cumulative exposures to Gibb's study).[9] According to Dr. O'Connor, the Gibb study
9    "concluded that 68.1% of the cohort studied had a clinical finding of 'irritated nasal septum' within a
10   mean (median) time of 89 days (0.36 work year) from date of first hire if the mean (median) exposure
11   at the time of first diagnosis was 0.048 mg $(CrO_3)/m^3$." *Id.* However, even assuming that Dr.
12   O'Connor's calculations are correct, according to Dr. O'Connor, the Gibb study examined workers'
13   "irritated nasal septum," which is not an injury claimed by Ms. Wakeland.

14   With respect to Ms. Wakeland's claim that chrome VI exposure caused her poor dentition, Dr.
15   Sawyer cites a NIOSH threshold which refers to a 1975 NIOSH document recognizing that chrome VI
16   exposure can cause "erosion and discoloration of the teeth," and then he states that 1.0 $\mu g/m^3$ is the
17   minimum threshold at which poor dentition could occur. Tercero Decl. Ex. 16 at 298:7-299:3 (Sawyer
18   Dep.); Ex. 30 at 2, 49, 60 (NIOSH Hexavalent Chromium Update). The 1.0 $\mu g/m^3$ threshold is based
19   on the Recommended Exposure Limit ("REL") established by NIOSH to govern workplace exposures.
20   Tercero Decl. Ex. 30 at 2, 49, 60 (NIOSH Hexavalent Chromium Update). The NIOSH REL is set for
21   workers based on a ten hour weighted average exposure over the course of a work week. Tercero Decl.
22   Ex. 4 at 111:15-22 (O'Connor Dep.).

23   Defendants raise a number of challenges to plaintiffs' reliance on the NIOSH REL. Defendants
24   contend that a regulatory standard is an inappropriate measure for legal causation because "a regulatory

---

[9] Dr. O'Connor cited and discussed the study in his declaration, but it does not appear that plaintiffs submitted a copy of the study to the Court. The study is cited in Dr. O'Connor's declaration as "Gibb, H.J, P.S.J. Lees, P.F. Pinsky, and B.C. Rooney, 'Clinical Findings of Irritation among Chromium Chemical Production Workers,' America Journal of Industrial Medicine, 38: 127-131 (2000)."

*United States District Court*
*For the Northern District of California*

standard, rather than being a measure of causation, is a public-health exposure level that an agency determines pursuant to statutory standards set by Congress." *Sutera v. Perrier Group of America, Inc.*, 986 F. Supp. 655, 664 (D. Mass. 1997); *see also Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996) (distinguishing between OSHA regulations and causation in tort cases by noting that the "agencies' threshold of proof is reasonably lower than that in tort law, which 'traditionally make[s] more particularized inquiries into cause and effect' and requires a plaintiff to prove that it is more likely than not that another individual has caused him or her harm.'") (citation omitted). Defendants further argue that even applying the 1.0 μg/m$^3$ threshold, Ms. Wakeland cannot show how her short term exposures exceed the NIOSH REL level, which is based on occupational exposures.

Plaintiffs respond that it is appropriate to rely on a regulatory standard for causation. However, the authority that plaintiffs cite does not support this position. Plaintiffs cite *General Electric Company v. Joiner*, 522 U.S. 136, 153-54 (1997), for the proposition that it is not intrinsically "unscientific for experts to rely on the work of regulatory agencies, including work derived from risk assessment methodologies." Opp'n at 19:4-6. However, as defendants correctly note, plaintiffs misquote the language of the cited portion of the opinion, and the citation is to the dissent in the case. *See Joiner*, 522 U.S. at 153-54 (Stevens, J., dissenting). In *Joiner*, the Supreme Court held that the district court had properly excluded expert testimony as unreliable because the studies upon which the experts relied were not sufficient to support their conclusions. *Id*. at 146-47. In his dissent, Justice Stevens addressed the experts' use of a "weight of the evidence methodology": "It is not intrinsically 'unscientific' for experienced professionals to arrive at a conclusion by weighing all available scientific evidence—this is not the sort of 'junk science' with which *Daubert* was concerned. After all, as Joiner points out, the Environmental Protection Agency (EPA) uses the same methodology to assess risks, albeit using a somewhat different threshold than that required in a trial." *Id*. at 153. Neither Justice Stevens nor the majority addressed the question of whether it was appropriate to rely on regulatory standards for causation.

Plaintiffs' reliance on *Hollander v. Sandoz Pharmaceuticals Corporation*, 289 F.3d 1193 (10th Cir. 2002), is similarly unavailing. Plaintiffs cite *Hollander* for the proposition that "regulatory review processes are 'far more careful and systematic' than the traditional peer review process." Opp'n at 19:7-

15

8 (quoting *Hollander*, 289 F.3d at 1215 n.20). In *Hollander*, the Tenth Circuit affirmed a district court's exclusion of expert testimony and grant of summary judgment in favor of defendants in a pharmaceutical personal injury case. The plaintiff, who had suffered a stroke, relied on, *inter alia*, an FDA determination that the drug in question had not been shown to be safe when prescribed as a postpartum lactation suppressant. *Id*. at 1214. The Tenth Circuit stated,

> As to the FDA determination, this circuit has noted that differing standards militate against applying regulatory actions to the elements of tort law. . . . In assessing a district court's application of Daubert, we discounted a state agency's classification of a substance as a carcinogen, stating that the methodology employed by the agency "results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances," and that "[t]he agencies' threshold of proof is reasonably lower than that appropriate in tort law."

*Id*. at 1215 (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 n.3 (10th Cir. 1999)). The footnote cited by plaintiffs simply cautions, "Our conclusion about the FDA's decision to withdraw the indication for Parlodel as a lactation suppressant should not be read to suggest that, as a general rule, regulatory decisions lack the intellectual rigor necessary under the *Daubert* reliability inquiry." *Hollander*, 289 F.3d at 1215 n. 20. *Hollander* did not hold that regulatory standards may be used to show causation, and indeed it suggests otherwise.

In any event, even if plaintiffs can rely on the NIOSH REL in support of causation, they have not shown how Ms. Wakeland's short term exposures exceed the NIOSH REL, which is based on occupational exposures, nor have they explained why, absent an exposure that exceeds the NIOSH REL, it is appropriate to rely on the NIOSH REL to establish causation. Instead, Dr. Sawyer simply refers to a NIOSH regulatory standard governing workplace exposures generally, and then concludes that because Ms. Wakeland spent some time at locations in Willits which, according to the PHA, had air concentrations above these levels, Ms. Wakeland was injured. As with plaintiffs' other evidence of causation, there is "too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 147. Accordingly, the Court GRANTS summary judgment in favor of defendants on Ms. Wakeland's claims of exposure between 1971 and 1975.

### C.  Medical monitoring

Both plaintiffs seek an award of future medical monitoring based on their claimed exposure to

16

TCE and chrome VI. The California Supreme Court has held that the cost of medical monitoring is a compensable item of damages "where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable."

> In determining the reasonableness and necessity of monitoring, the following factors are relevant: (1) the significance and extent of the plaintiff's exposure to chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to (a) the plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of the members of the public at large of developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5) the clinical value of early detection and diagnosis.

*Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1009 (Cal. 1993). The *Potter* court emphasized that "[t]he five factors provide substantial evidentiary burdens for toxic exposure plaintiffs and do not, as Firestone insists, allow medical monitoring damages to be based solely upon a showing of an increased but unquantified risk resulting from exposure to toxic chemicals." *Id*.

The California Supreme Court has also held that in order to recover for fear of developing cancer as a result of exposure to toxic substances, a plaintiff must first prove the elements of a negligence cause of action, and also, *inter alia*, "establish the reasonableness of his or her fear of cancer. *Id*. at 989. "A carcinogenic or other toxic ingestion or exposure, without more, does not provide a basis for fearing future physical injury or illness which the law is prepared to recognize as reasonable." *Id*. The Court added that "emotional distress caused by the fear of a cancer that is not probable should generally not be compensable in a negligence action." *Id*. at 990.

The Court concludes that plaintiffs have failed to raise a triable issue of fact regarding their claims for medical monitoring based on TCE and chrome VI exposure. As discussed above, plaintiffs have not demonstrated that they were exposed to TCE above the level that plaintiffs' experts concede is the absolute minimum for causation. Plaintiffs' experts could not quantify any level of TCE exposure for Ms. Smith. With regard to Ms. Wakeland, plaintiffs' experts could not quantify any level of TCE exposure after 1975, and the experts' opinions about TCE exposure from 1971 to 1975 are speculative and lack a scientific basis. For both plaintiffs, the estimated airborne levels of chrome VI after 1975 were well below the injury thresholds set forth by plaintiffs' own experts. Finally, for the 1971 to 1975

period, plaintiffs rely on occupational studies, regulatory standards, and theories of "peak exposures" without any showing that Ms. Wakeland was exposed to chrome VI at the levels identified in the studies or regulatory standards, and there is no evidence that Ms. Wakeland ever experienced a "peak exposure." Accordingly, the Court GRANTS summary judgment in favor of defendants' on plaintiffs' claims for medical monitoring.

**2.     Plaintiffs' motions to exclude Dr. Guzelian and Frank Altmayer**

Plaintiffs have moved to exclude the opinions and testimony of two defense experts, Dr. Guzelian and Frank Altmayer. Defendants did not rely on the opinions or testimony of either expert in support of their motion for summary judgment. In light of the disposition of defendants' motion for summary judgment, the Court finds it unnecessary to adjudicate these motions, and they are DENIED AS MOOT.

### CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion to exclude and for summary judgment, and DENIES AS MOOT plaintiffs' motions to exclude expert opinion and testimony. Docket Nos. 157, 160 & 172.

**IT IS SO ORDERED.**

Dated: July 13, 2011

SUSAN ILLSTON
United States District Judge